GOVERNMENT OF the CANAL ZONE, Plaintiff-Appellee,

v.

David SIERRA, Jr., Defendant-Appellant.

No. 77–5551.

United States Court of Appeals, Fifth Circuit.

April 26, 1979.

**62**

Daniel D. Douglass (Court-appointed), Balboa, Canal Zone, for defendant-appellant.

Frank J. Violanti, U. S. Atty., Wallace D. Baldwin, Asst. U. S. Atty., Balboa, Canal Zone, for plaintiff-appellee.

Before GOLDBERG, Circuit Judge, SKELTON, Senior Judge *, and FAY, Circuit Judge.

SKELTON, Senior Judge.

Appellant, David Sierra, Jr., was charged by information with first-degree murder of Ovidio de Jesus Marin R. (Ramirez) in violation of Panama Canal Zone Code Title 6, § 1183(a) and possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a). The cases were consolidated and the offense of first-degree murder was reduced to second-degree murder, after which the Appellant pleaded guilty to the consolidated charges. He was thereupon sentenced to life imprisonment on the murder charge and to five years imprisonment on the marijuana charge to be served concurrently with the sentence in the murder charge. The Appellant appealed these sentences and this court reversed and remanded both convictions on January 27, 1977, on the ground that the district court had failed to fully explain the charges to Appellant and had failed to fully interrogate him as to his understanding of the charges when he pleaded guilty to them. See *Sierra v. Government of the Canal Zone*, 546 F.2d 77 (5 Cir. 1977).

On remand, Appellant was allowed to replead, and he pleaded not guilty to both charges. The consolidated case was set for trial, whereupon Appellant filed a motion to suppress (1) his confession, and (2) items seized in the search of Appellant's home and automobile. A lengthy hearing was conducted on the motion after which the district court denied it. The Appellant was then tried before a jury and convicted on both charges. He was again sentenced to life imprisonment on the murder charge and to five years imprisonment on the marijuana charge to be served concurrently with the murder sentence. The Appellant has appealed his murder conviction to this court in the instant action, but has not appealed his conviction of the marijuana charge. The Appellant contends that the trial court

* Senior Judge of the United States Court of Claims, sitting by designation.

erred (1) in admitting into evidence his written and signed confession; and (2) in admitting into evidence items seized in a search of his home and automobile. We find and conclude, however, that the trial court did not commit error in admitting such items into evidence, and that Appellant's conviction should be affirmed.

## I. FACTS

The saga of this case first began when Appellant was arrested for possession of marijuana on October 5, 1973, in the Panama Canal Zone. He was advised of his rights at the scene of the arrest and he indicated that he understood those rights. He chose to cooperate with the police. In fact, Appellant took police officers to an area in the Canal Zone where he had stored the marijuana prior to the time of his arrest. Appellant failed to fully cooperate, however, as he refused to identify the source from whom he had obtained the contraband. On Monday, October 8th, Appellant was taken before the Balboa Magistrate Court, advised of the charge against him, warned of his rights, and the public defender was appointed to represent him.

On the morning of October 9th, Appellant requested to see Detective Steele, indicating that he was interested in cooperating further. Detective Steele cleared this meeting with both the United States Attorney and the public defender. At this time, Appellant named his supplier as a Colombian called "Antonio." Furthermore, Appellant agreed to act as an undercover agent and assist police in making a case against "Antonio." In return for this help, the charges against Appellant were held in abeyance and he was released on his own recognizance. Appellant was required, however, to maintain daily contact with police.

On October 12th, Appellant arranged a meeting between "Antonio" and an undercover operative of the Balboa narcotics unit, Officer Daniel Maravilla. At this meeting, "Antonio" was introduced as Miguel.[1] Offi-

cer Maravilla arranged to purchase some marijuana from Miguel which was to be delivered around the 28th of October.

Subsequent to that meeting, from October 12th to October 24th, the Appellant continued to report in as required. However, from October 25th through October 30th, Appellant made no contact with the police and the police were unable to locate him.

On October 31st, Miguel's bullet-riddled body was found in the forest. Also on this date, Appellant contacted the police to check in. He was told to come to the police station right away. Appellant and his wife arrived at the police station at about 4:00 to 4:30 P.M., and he was immediately taken to the morgue where he confirmed the deceased's identity as being Miguel. Thereafter, Appellant, although not under arrest, was taken to a conference room and read his rights. He was then questioned by police, while his wife waited in another part of the station.

For about the first fifty minutes of the questioning Appellant denied having any knowledge of the killing, claiming that he had been home all day and night of October 30th, the date of the murder. He also claimed that the last time he had seen Miguel was during the meeting he had arranged on October 12th. But when a break for dinner was taken, it was discovered by the police that Appellant's wife, who had been talking to another police officer, told a different story and had said that on October 30th two men she believed to be Colombians had come to their home and that Appellant had left with them.

After dinner, when confronted with the discrepancy between his story and his wife's, Appellant changed his story. He then admitted that Miguel and an unidentified Negro came to his home on October 30th and that he had accompanied them on a trip to pick up the marijuana which Miguel had agreed to deliver. But this story was

---

1. The real name of "Antonio" and "Miguel" was Ovidio de Jesus Marin R. (Ramirez). He will be referred to herein as Miguel.

also exculpatory. Appellant stated that he had loaned the Negro his gun while on the trip and when the Negro began firing it in the forest, that he, the Appellant, got in the truck and left Miguel and the Negro there in the forest because he was afraid the shots would bring the police. Appellant stated that the following day the Negro returned his gun, off-loaded 350 pounds of marijuana into Appellant's house, and informed Appellant that he, the Negro, was now handling the marijuana deal and would make the delivery to the "gringo." Lastly, Appellant told police that the cartridge clip to his gun was hidden behind the stereo speaker in his house, that the marijuana was stacked in a closet of his home, and that he had hidden the gun in the house but couldn't remember where.

At this point the police told Appellant that they were in touch with the Panamanian authorities and that the Panamanians would probably search Appellant's house, since it was in the Republic of Panama. Appellant responded that he did not mind their searching his house, but was concerned for his children who would be at home. Mrs. Sierra, who was also advised of a probable search to be made by the Panamanians, assisted the police by making a drawing indicating how to get to the house. She also told them a truck and Appellant's car would be parked in front of the house.

The liaison officer of the Canal Zone police then contacted the Panamanian police (the DENI) who made arrangements with the Panamanian district attorney for the search of Appellant's house and car. The record does not show what these arrangements were. It is not known whether or not the Panamanian police obtained a search warrant, nor whether one was required under the laws of the Republic of Panama. In any event, the Canal Zone police had no control over what the DENI did.

The Panamanian police went to Appellant's house accompanied by the liaison officer of the Canal Zone police, and placed it under surveillance prior to 9:00 P.M., as the Negro was supposed to come to the house at that time according to the story of Appellant. After a long wait during which the Negro did not show up, the Panamanian police approached the house. The door to the house was open and there were some young people inside, the oldest being about 14 years of age. The DENI identified themselves and stated their purpose in being there. No objection was made by the occupants of the house. The Panamanian police then entered and searched the house and the car. They found about 350 pounds of marijuana, and also found the gun clip behind the stereo where Appellant had stated he had placed it. The pistol of Appellant was found in the glove compartment of his car. The marijuana, the gun and gun clip were then taken by the DENI to their headquarters where they were inventoried. The gun and gun clip were then released by the DENI to the liaison officer of the Canal Zone police.

While the search and surveillance were being conducted, the questioning of Appellant continued. At about 9:45 P.M. Appellant stated that he had not told the whole story, but would like to talk to his wife before telling the truth. Appellant then conversed with his wife for about 25 to 30 minutes, and at or about 10:15 P.M. began to give an inculpatory statement. The story he told began much like the one Appellant had previously related, but with these additions, he said that Miguel and the Negro began arguing about how they would divide some cocaine that they were planning to pick up. Miguel became angry and accused Appellant of siding with the Negro. Then Miguel started swearing and started toward the truck. Appellant remembered that there was a machete in the truck, whereupon he panicked and opened fire on Miguel with his pistol, shooting him in the back 5 times, and continuing to fire his gun until it was empty. Appellant was then asked to put this story in writing, which he did in his own handwriting. This was the confession that was the subject of Appellant's Motion to Suppress and which was introduced into evidence at the trial. Appellant was placed under arrest for the first time for the murder of Miguel after he had confessed.

## II. ADMISSIBILITY OF THE CONFESSION

Appellant contends that the confession was inadmissable because the prosecution failed to sustain its burden of demonstrating that he knowingly and intelligently waived: (1) his privilege against self-incrimination; and (2) his right to retained or appointed counsel.

■ Appellant's Fifth Amendment privilege against self-incrimination, and its associated right to counsel, is controlled by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny. In *United States v. Montos*, 421 F.2d 215 (5 Cir. 1970), a part of that progeny, this court held as follows:

"When a defendant warned of his rights makes statements without a lawyer present, the prosecution may use these statements at trial only if it sustains its 'heavy burden' of demonstrating that the defendant 'knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.' *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). *See also Gilpin v. United States*, 5 Cir. 1969, 415 F.2d 638; *Moll v. United States*, 5 Cir., 1969, 413 F.2d 1233. To be valid, a waiver must be made voluntarily, *United States v. Ogle*, 5 Cir., 1969, 418 F.2d 238, and may not be presumed 'simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.' *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966). An express statement that the individual does not want a lawyer is not required, however, to show that the individual waived his right to have one present. *See Bond v. United States*, 10 Cir., 1968, 397 F.2d 162, 165. All that the prosecution must show is that the defendant was effectively advised of his rights and that he then intelligently and understandingly declined to exercise them. *See Carnley v. Cochran*, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962)." 421 F.2d at 224.

In our case Appellant came freely and voluntarily to the police station when requested to do so. After going to the morgue with the police to confirm the identity of the deceased, he went back to the police station where he was advised of his rights prior to the commencement of any questioning. *He replied that he understood those rights.* Appellant's confession, written in his own handwriting, commences as follows: "I David Sierra, Jr. make the following statement *voluntarily.* I was advised of my legal right as stated on a right's card which I had read to me by Detective Howard Marks. *I told Detective Howard Marks that I understood my right. I don't want a lawyer present at this time.*" (Emphasis supplied). And on cross-examination at the hearing on the motion to suppress the confession, Appellant testified that he had been warned of his rights, *that he knew he had the right to remain silent, and that he knew he had the right to have an attorney present.* (Emphasis supplied). Also, it is important to note in passing, that Appellant's rights had been read to him on at least three occasions in connection with his arrest on October 5th for possession of marijuana, as well as on October 9th when he informed the police as to the identity of his source, and had, on each of these occasions, replied that he understood those rights. Also, in connection with the previous charge, he exercised his right to remain silent when he initially refused to identify his source, and his right to counsel was complied with when an attorney was appointed to represent him. And lastly, a United States magistrate carefully read and explained his rights to Appellant when he appointed counsel to represent him on the marijuana charge.

There is no contention that Appellant was not informed of his *Miranda* rights at all relevant times when dealing with the police. The trial judge, out of the presence of the jury, had a plenary hearing on Appellant's Motion to Suppress and found the evidence sufficient to show that the confession in question was freely and voluntarily given with full knowledge by Appellant of

his rights. At the conclusion of that hearing, the court found:

"_ _ _ the Court finds that the accused, when making the statement, was conscious and was capable of understanding what he said he did, and that he was not induced to make the statement under compulsion or by infliction of threat, or infliction of suffering upon him or another, or by prolonged interrogation under such circumstances as to render the statement involuntary, or by threats or promises concerning action to be taken by a public official with reference to the crime, likely to cause the accused to make a statement falsely.

"The Court finds that in connection with the statement the MIRANDA warnings were given; that the defendant knowingly and intelligently waived his privilege against self incrimination; that he knowingly and intelligently waived his right to have retained or appointed counsel present at the interrogation; and that the statement of confession made by him was freely made."

The evidence fully supports these findings, and we will not disturb them as we agree that they are correct.

The allegation with regard to Appellant's Sixth Amendment right to counsel is controlled by *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); and *United States v. Brown*, 569 F.2d 236 (5 Cir. en banc 1978). In *Massiah*, the Supreme Court established the rule that once adversary proceedings have commenced against an individual, he has a Sixth Amendment right to legal representation when the Government interrogates him. See *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). The Supreme Court reiterated in *Massiah* the principle laid down in *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527 (1932), that:

" '. . . during perhaps the most critical period of the proceedings . . that is to say, from the time of their arraignment until the beginning of their trial, when consultation, thoroughgoing investigation and preparation [are] vitally important, the defendants . . . [are] as much entitled to such aid [of counsel] during that period as at the trial itself.' " 377 U.S. 205, 84 S.Ct. 1202, 12 L.Ed.2d 250.

And in *Brewer* the Court held:

"Whatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him— 'whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' *Kirby v. Illinois*, supra, 406 U.S. 682, at 689, 92 S.Ct. 1877, 32 L.Ed.2d 411. See *Powell v. Alabama*, supra [, 287 U.S. 45,] 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527; *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357; *Hamilton v. Alabama*, 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114; *Gideon v. Wainwright*, supra [372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799]; *White v. Maryland*, 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193; *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246; *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178; *Coleman v. Alabama*, supra [399 U.S. 1, 90 S.Ct. 1999, 26 L.Ed.2d 387]." 430 U.S. 398, 97 S.Ct. 1239, 51 L.Ed.2d 436.

It is sometimes difficult to determine when a person's Sixth Amendment right to counsel attaches. In *Massiah*, the Supreme Court indicated that the right attaches during critical stages of the proceedings, including interrogations *from the time of arraignment.* (377 U.S. at 205, 84 S.Ct. 1199). *Brewer* spoke of critical stages of the proceedings as including interrogations: *"At or after the time that judicial proceedings have been initiated against him—'whether by way of formal charge, preliminary hearing, indictment, information or arraignment.'* " (430 U.S. at 398, 97 S.Ct. at 1239).

And in *Lee v. United States*, 322 F.2d 770, 778 (5 Cir. 1963), this court recognized the need of a person accused of a crime for an attorney *right after his arrest.*[2]

Applying these principles to the instant case we see that the questioning of Appellant began when he was asked to come to the police station and confirm the identity of an apparent homicide victim. There is absolutely nothing in the record to indicate that there existed, at that time, one shred of evidence which would link Appellant to the crime, nor even make him a suspect. In fact, the record indicates that the questioning of Appellant was merely the normal place for police to start their investigation of Miguel's death. Appellant was the last person known to have seen the victim alive. The last contact police had with Miguel ended when Miguel and Appellant departed from the October 12th meeting; and, in fact, Appellant appears to have been the only known acquaintance of the victim. It was natural for the police to assume that Appellant knew more about Miguel and his associates in the marijuana and drug traffic then anyone else. It was logical for the police to ask the Appellant for whatever information he had about Miguel. In the beginning, Appellant's statements were non-committal and purely exculpatory. However, about 9:45 P.M. Appellant told police that he hadn't told the whole story, but would like to talk to his wife before telling the truth. Appellant spent the next 25 to 30 minutes conferring privately with his wife, and at 10:15 P.M. he confessed to the murder. He was then arrested by the police for the first time. Appellant admits in his brief that "[h]e was not a suspect or being detained until after 10:00 P.M. . . ."

■ It is clear from these facts that prior to and at the time of Appellant's confession no judicial or adversary proceedings had been initiated against him in the way of a formal charge, an information or indictment. He had not been arrested nor arraigned, and had not been subjected to a preliminary hearing. Accordingly, we con-clude that Appellant's Sixth Amendment right to counsel, as distinguished from his right to counsel in connection with his Fifth Amendment privilege against self-incrimination, had not attached at the time the confession was given.

If it could be assumed *arguendo* that Appellant's Sixth Amendment right to counsel had attached prior to the time of his confession, we would then be required to face the question of whether or not he waived such right. The Court in *Brewer* unquestionably recognized that such right could be waived, and discussed the standard to be applied in such cases, as follows:

". . . the proper standard to be applied in determining the question of waiver as a matter of federal constitutional law—that it was incumbent upon the State to prove 'an intentional relinquishment or abandonment of a known right or privilege.' *Johnson v. Zerbst*, 304 U.S. [458,] at 464, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357. That standard has been reiterated in many cases."

Moreover, the Court in *Brewer*, stressed that a "waiver [of this constitutional right] requires not merely comprehension but relinquishment" of that right. (430 U.S., at 404, 97 S.Ct., at 1242).

In *United States v. Springer*, 460 F.2d 1344 (7 Cir. 1972), the Seventh Circuit held that:

". . . [a] (signed waiver form and the undisputed testimony that the form had been read to and by the defendant and that he said he understood) is sufficient to raise a presumption of validity and shift the burden of going forward to the accused who must present some facts tending to show that the waiver was not voluntary or knowledgeable." 460 F.2d, at 1349.

And the court in that case further held that where the district court has determined that a confession was admissible, thereby finding a proper waiver:

"[t]his . . . finding is entitled to substantial deference and we will not

2. Emphasis supplied as indicated above.

overturn it if it is substantially supported." (Citations omitted). 460 F.2d, at 1348.

In *Brewer* the appellant did go forward and present evidence negating the presumption of waiver which had been established by the prosecution. The Court found that although Brewer, a recent escapee from a mental hospital, had been informed of his right to counsel and appeared to understand that right, his consistent reliance upon the advice of counsel in prior dealings with authorities (on the charge for which he was being detained), and the fact that he had told the police he would tell the whole story ·after seeing his attorney, plus the fact that the police had agreed not to interrogate him while he was being transported, but induced him to reveal inculpatory evidence by psychological methods "tantamount to an interrogation", negated any presumption that he had relinquished his right to counsel. But in our case the Appellant has failed to go forward with the evidence and present any significant fact that the relinquishment of his right to counsel was not done freely, voluntarily, and with full understanding.

█ The undisputed evidence that Appellant had been read his rights and replied that he understood those rights, the testimony by Appellant at the suppression hearing that he understood his rights at the time they were read to him, and the written statement in Appellant's confession that he did not want counsel, clearly constitutes sufficient evidence upon which the district court found that Appellant *understood* his right to counsel. Just how such understanding could have been better shown is not readily apparent. In this connection, the district court found and concluded at the end of the hearing on the Motion to Suppress:

> "The court finds _ _ _ that he [Appellant] *knowingly and intelligently* waived his right to have retained or appointed counsel present at the interrogation; and that the statement of confession made by him was freely made." (Emphasis supplied).

We also find and conclude that the evidence clearly establishes that Appellant knowingly *relinquished* his right to counsel. For despite his understanding that he was entitled to have counsel present, Appellant deliberately chose to speak with police without counsel. His handwritten confession declared, "I don't want a lawyer present at this time." And, whereas, in *Brewer* the Court emphasized that the defendant in that case had consistently sought and followed the advice of counsel, in our case, the record clearly shows that with regard to both the questioning concerning the homicide, and with regard to his earlier marijuana arrest for which counsel had been appointed to represent him, Appellant consistently sought to handle his own affairs. And this, we conclude, was sufficient for the trial court to find relinquishment, where there has been no showing of significant factors which would negate such a relinquishment. See *Brewer v. Williams, supra; Taylor v. Elliott,* 458 F.2d 979 (5 Cir. 1972); and *Queen v. United States,* 118 U.S.App.D.C. 262, 335 F.2d 297 (1964).

█ Appellant would have this court hold that since he was represented by counsel in the marijuana case he could not, without notice to that counsel, have waived his Sixth Amendment right to confer with counsel in the homicide case. This same contention was raised by the defendant in *Brewer* and the Court expressly declined to make such a ruling. Furthermore, this is not the first occasion that such a position has been urged before this court, but the court has previously shown no inclination to adopt such a *per se* rule, and we discern no need for such a holding in this case.

In *Wilson v. United States,* 398 F.2d 331 (5 Cir. 1968), this court held as follows:

> "It appears without dispute that appellants made oral admissions to agents of the Federal Bureau of Investigation out of the presence of appellants' counsel, the agents knowing that counsel has been appointed for appellants. That fact alone will not in our opinion render inadmissible the admissions made, as held in the case of *Coughlan v. United States,* 391

F.2d 371 (9th Cir. 1968)." 398 F.2d at 333.

In *Coughlan v. United States*, 391 F.2d 371 (9 Cir. 1968),[3] the Ninth Circuit also refused to adopt such a *per se* rule and acknowledged that even where one was represented by counsel he was entitled to waive that right if he so desired, saying:

"We are asked to rule that any statement, admission or confession secured by peace officers from a defendant represented by an attorney, where the attorney was not timely advised of the proposed interview or interrogation, be rejected as violative of the right to counsel. Appellant recognizes that this Sixth Amendment right may be voluntarily waived, but at oral argument, it was contended that such a waiver would never be knowing and truly voluntary unless counsel was present to advise the client.

"It may well be that the day is approaching when the right to counsel may be expanded to the point where an accused may only be interrogated by the police in the presence of his lawyer. However, no persuasive precedent for the holding here sought has come to our attention . . . Here a clear and knowing waiver was shown." 391 F.2d at 372.

See also, *United States v. Dowells*, 415 F.2d 801 (9 Cir. 1969), *Reinke v. United States*, 405 F.2d 228 (9 Cir. 1968), and *United States v. Springer*, 460 F.2d 1344 (7 Cir. 1972).

The facts of this case are even stronger against the Appellant than they were against the defendants in either *Wilson* or *Coughlan*. Here Appellant did not have an attorney, either retained or appointed, who was representing him with regard to the homicide concerning which he was being questioned. The public defender had been appointed to represent Appellant with regard to the charge stemming from his October 5th arrest for possession of marijuana, which charge was at that time being held in abeyance. This was the situation that existed in *United States v. Vasquez*, 476 F.2d 730 (5 Cir. 1973). In that case we unequivocally recognized that a voluntary waiver of counsel could exist, even though Vasquez was represented by appointed counsel on a state charge at the time he was questioned by federal agents, stating:

"In this case where the defendant was carefully apprised of his right to have the advice of his counsel, there is no merit in the contention that the defendant was unable to waive that right." 476 F.2d at 733.

This brings us to the *en banc* decision of this court in *United States v. Brown, supra*, which stated the law in this circuit on this issue, and which is dispositive of the question in this case. In that case, the defendant, Mary Brown, was represented on a state charge by the public defender, an attorney who had been appointed to defend her on that charge. While enroute to meet with him in the state courthouse, she was intercepted by F.B.I agents in the corridors of the building who gave her the *Miranda* warning and then had her to sign a waiver of rights form, which stated among other things: "I do not want a lawyer [present] at this time." The F.B.I. agents, knowing she had an attorney representing her on the state charge, then proceeded to question her on a federal charge. Later, on being prosecuted on the federal charge, she filed a motion to suppress the evidence thus obtained by the F.B.I. contending that it was illegally obtained because her attorney in the state case was not present when she was questioned about the federal charge. She argued that since she had counsel in the state case, she could not waive her Sixth Amendment right to have him present when she was questioned on the federal charge, and that the waiver form she signed was, therefore, invalid. Our *en banc* court held against her, saying:

"A voluntary waiver of the presence of counsel is recognized by this circuit. In a

3. Cert. denied, sub nom. *Coughlan v. United States*, 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968).

case very similar to the one at bar, *United States v. Vasquez*, 476 F.2d 730 (5th Cir. 1973), the defendant was in custody in a Florida county jail on a state charge of murder when an F.B.I. agent came to question him about an M–14 rifle that had been seized in connection with a recent shooting. Vasquez was advised of his rights including the right to the presence of counsel. He waived that right and agreed to discuss the rifle (not the shooting) with the F.B.I. agent. Vasquez was represented by appointed counsel on the state charge. He was subsequently charged and convicted of the federal crime of possession of an unregistered firearm. This court affirmed that conviction stating:

'In this case where the defendant was carefully apprised of his right to have counsel, there is no merit in the contention that the defendant was unable to waive that right.'

"The district court found that Mary Brown waived her right to the presence of counsel and thereafter made a voluntary statement to the F.B.I. agent." 569 F.2d 238.

\* \* \* \* \* \*

"The F.B.I.'s *Miranda* warnings were read to her by the agent and given to her to read and sign. *The trial judge found that Mary Brown understood these rights and under the clearly erroneous standard for review this finding was proper.* (Emphasis supplied.)

"Mary Brown made a clear and unequivocal waiver of any right she may have had to the presence of counsel."

\* \* \* \* \* \*

"On the facts of this case the court below correctly refused to suppress the statements obtained from Mary Brown. We therefore affirm the conviction."[4] 569 F.2d 239.

It thus appears that the instant case is practically on "all fours" with the *Brown* and *Vasquez* cases. Even the wording of the waiver of the right to counsel in *Brown* and in our case are practically word for word the same, namely, in *Brown*, the waiver stated:

"I do not want a lawyer at this time." In the instant case, the waiver stated:

"I [don't] want a lawyer present at this time."

We hold that the appellant made a clear and unequivocal waiver of any right he may have had to the presence of counsel prior to and at the time of his confession.

Thus far this court has attempted to gauge the admissibility of confessions by looking to the totality of the circumstances. As we said in *Narro v. United States*, 370 F.2d 329 (5 Cir. 1966):

"Thus the cases in which it is clear that the warnings have been given must be considered on their own facts in order to determine the question of waiver. The courts must do this on an *ad hoc* basis, since no *per se* rule has thus far been adopted dealing with this problem." 370 F.2d at 329–30.

A review of the cases which have dealt with contentions similar to the one urged by Appellant in this case clearly illustrates the desirability of case by case determinations. The totality of the circumstances standard has allowed courts sufficient flexibility to both insure the protection of individual liberties and yet refrain from placing such limits on the interrogation process as would "constitute an undue interference with a proper system of law enforcement", or "preclude police from carrying out their traditional investigatory functions." *Miranda v. Arizona, supra*, 384 U.S. at 481, 86 S.Ct. at 1631.

We hold that the evidence amply warrants the finding of the district court that Appellant freely and voluntarily made his confession with full comprehension of the rights he relinquished in making it, and that the district court correctly refused to

---

4. Four judges dissented, saying that they would hold that "the interrogation of [Mary] Brown was both unethical and unconstitutional."

Judge Hill concurred in the majority opinion, saying that in his opinion "our present case is a *Vasquez* case, not a *Brewer* case."

suppress the confession. We hold further that the confession was properly introduced into evidence at the trial on the merits.

## III. THE SEARCH OF APPELLANT'S HOUSE AND CAR

As stated above,[5] when the Appellant confessed, he stated to the police that the 350 pounds of marijuana was in a closet in his house and that he had put the pistol clip behind his stereo in the house. He also said the pistol was in the house, but he did not remember where he had put it. The Canal Zone police told him that the Panamanian police would probably search his house, and he replied that he did not mind that, but he did not want any doors kicked in or windows knocked out, because he was concerned about his children who were in the house. He then described the location of the house. The police also told Mrs. Sierra that the Panamanian police would probably search the house. She then drew a map indicating how to find the house. She also said a truck and Appellant's car would be parked in front of the house.

The Canal Zone liaison officer informed the Panamanian police of the situation. The Panamanian police then made arrangements with their district attorney for a search of Appellant's house. The record does not show what those arrangements were.

A member of the Panamanian district attorney's staff and several units of the Panamanian police then went to Appellant's house, accompanied by the Canal Zone liaison officer. When they reached the house, the door was open and three children were inside, one of whom was a boy about 14 years of age. The DENI identified themselves to the children and stated the purpose of their visit. The children admitted them into the house. The DENI then proceeded to search the house. They found the 350 pounds of marijuana in a closet where Appellant had said it would be. They also found the gun clip behind a stereo speaker where Appellant said he hid it. The pistol was found in Appellant's car that was parked in front of the house. All of these items were then taken to the DENI headquarters where they were inventoried. The DENI then released the gun and gun clip to the Canal Zone police liaison officer. The Appellant filed a motion to suppress the items found in the search of his house and auto. A lengthy hearing was held by the trial judge, and at its conclusion the judge denied the motion, finding and concluding as follows:

"With respect to the search of the house, the Court finds that, first of all, both the defendant and his wife, and with respect to his wife she certainly was not under any kind of custody or control whatsoever. (sic). After they had had their last conversation in which he stated he was going to tell the Police the entire truth, he voluntarily told the Police of the contents of the house, that is, the gun, the clip, and the quantity of marijuana; described the location of the house; described the automobiles that would be parked around the house; and the wife even went to the extent of drawing a map or a diagram to enable the Panamanian Police Liaison Officer to locate the house; that the information was forwarded by him to the Panamanian authorities; and that pursuant to the story told by the defendant at that time, that a deal was going down at 9:00 o'clock, the Panamanian authorities, with the Canal Zone Liaison Officer, went to the scene of the house. They kept the house under surveillance for some time. After the appointed hour of 9:00 o'clock, when the alleged purchaser was to show up and did not appear, they approached the house. The front door was open; there were children inside; they were admitted by the children; and as a result of the search they found the pistol, clip, and the marijuana.

"The Court further takes judicial notice of the fact that the Canal Zone Liaison Officer had no jurisdiction nor authority to act in a police matter on his own initiative; that under the Panamanian

5. Many facts are repeated in the interest of clarity.

laws it would have been solely under the control and jurisdiction of the Panamanian Police. And the Court is of serious doubt that the Canal Zone Police Officer could have stopped the Panamanian Police had he even thought that they were doing anything wrong, having had some experience with them myself. I don't know if that entitles me to take judicial notice of it. But in any event, the Court is inclined to hold, and does hold, that it was a search by consent based upon probable cause and at the very least there was, if not an express, an implied consent by both the defendant and his wife. Certainly, although the ages of the children are not shown in the record, there certainly was, at least at that point, consent also by them.[6]

"So far as the search of the automobile is concerned, the Court is of the opinion that that likewise was a valid search; that there certainly existed probable cause to search the automobile in the belief that it contained instruments of crime and that such was very likely to disappear or be unavailable at a future date, and that there was therefore, for the purpose, exigent circumstances also."

■ The Appellant contends that the court erred in denying his motion to suppress the marijuana, pistol clip and pistol seized in the search of his house and car, because he argues, the search violated his constitutional rights under the Fourth Amendment. We do not agree. It is fundamental that a police search is valid if made with the consent of the owner or occupant of property even if made without a search warrant.[7] *Zap v. United States*, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed.2d 1477

(1946). The district court found as a fact that the search was made by consent of Appellant and by his wife and children and upon probable cause. We think the evidence supports this finding. In any event, it is not plainly erroneous,[8] and we will not disturb it.

■ In the next place, the district court found that the search was made in the Republic of Panama, a foreign country, by Panamanian authorities, and that the search was solely under the control and jurisdiction of the Panamanian police, even though the Canal Zone liaison officer, who had no authority or jurisdiction whatever in Panama, accompanied them. Here again, the district court's findings on questions of fact are supported by the evidence. In any event, they are not plainly erroneous. Under these circumstances, Appellant's Fourth Amendment rights were not violated.

■ Furthermore, Fourth Amendment rights are generally inapplicable to an action by a foreign sovereign in its own territory in enforcing its own laws, even though American officials are present and cooperate in some degree. See *Birdsell v. United States*, 346 F.2d 775, 782–3 (5 Cir. 1965).[9] The facts show that Appellant confessed to the murder five different times during the proceedings, as follows: First, when he confessed orally to the police; second, in his handwritten confession; third, when he went to the scene of the murder and re-enacted it for the police; fourth, when he testified at the hearing on his motion to suppress; and fifth, when he testified in his own behalf at the trial. We concluded above that his confession was admissible.

Appellant's confession was corroborated by many facts without considering the mar-

---

6. At the trial on the merits the evidence showed that one of the children was about 14 years of age.

7. The record does not show whether or not the DENI got a search warrant, nor whether one was required under Panamanian law, nor whether they otherwise complied with the laws of Panama in making the search. The prosecution was not required to make such proof. See *United States v. Morrow*, 537 F.2d 120, 140 (5 Cir. 1976).

8. See Rule 52(b), Federal Rules of Criminal Procedure.

9. For a discussion of Fourth Amendment rights relating to searches in foreign countries, see *United States v. Morrow*, 537 F.2d 120, 139 and 140 (5 Cir. 1976). Neither of the exceptions mentioned in that case, namely (1) where the search shocks the judicial conscience, or (2) where the foreign authorities were acting as agents of American officers, applies to the instant case.

ijuana, gun and gun clip seized in the search of his house and car. The record shows that while Appellant was writing his confession, an officer asked him, "Where did you get the weapon?" He answered by producing a bill of sale for the sale of a 22 caliber Ruger pistol from the Balboa Gun Club to him, which was introduced into evidence. Five discharged 22 caliber shells or casings were found at the scene of the murder. An autopsy of the body of the deceased revealed that he had been shot in the back 5 times with small caliber bullets, one of which killed him. The body of the deceased was found at the spot where the Appellant said he shot him.

At the trial, the pistol clip and the five discharged 22 caliber shells were introduced into evidence without objection (R.243–4 and 291). Neither the marijuana nor the pistol were put in evidence. However, a ballistics expert testified on direct and cross-examination, without objection, that results from test firing Appellant's pistol, which was identified by the serial numbers on the gun and on the bill of sale furnished by the Appellant, showed that it was the same pistol that fired the five 22 caliber cartridge shells found at the scene of the murder. Therefore, the only "fruits" of the complained-of search consisted of the ballistics testimony and the introduction of the gun clip. Such evidence was cumulative. In view of the overwhelming evidence of Appellant's guilt, if there was any error in admitting such evidence, it was harmless beyond a reasonable doubt. See Rule 52(a), Federal Rules of Criminal Procedure; *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); and *United States v. Anderson*, 500 F.2d 1311, 1318–19 (5 Cir. 1974).

We hold that the action of the district court in denying Appellant's Motion to Suppress was proper.

Accordingly, Appellant's conviction is affirmed.

AFFIRMED.

GOLDBERG and FAY, Circuit Judges, concur in the result.