**Clinton HILL, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 79–830.**

District of Columbia Court of Appeals.

Argued Jan. 8, 1981.

Decided Aug. 5, 1981.

William J. Mertens, Public Defender Service, Washington, D. C., with whom Silas, J. Wasserstrom and Randy I. Bellows, Public Defender Service, Washington, D. C., were on the briefs, for appellant. Stephen Bright and Timothy D. Junkin, Public Defender Service, Washington, D. C., also entered appearances for appellant.

Harold Damelin, Asst. U. S. Atty., with whom Charles F. C. Ruff, U. S. Atty. and John A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before KELLY, KERN and MACK, Associate Judges.

KELLY, Associate Judge:

In this challenge to his conviction for second-degree murder while armed, D.C. Code 1973, §§ 22–2403, –3202(a)(1), and carrying a pistol without a license, D.C. Code 1973, § 22–3204, appellant raises four issues: (1) whether the government violated the Interstate Agreement on Detainers; (2) whether the trial court erred by failing to limit the number of prior convictions used to impeach his credibility after he took the stand and by permitting mention of the particular crimes for which he had been convicted; (3) whether his Sixth Amendment right to counsel was violated when the government was permitted to use, for impeachment, a statement elicited from him, while he was in custody in New York State, by an undercover Drug Enforcement Administration agent investigating other criminal activity; and (4) whether the prosecutor's closing argument was so misleading and inflammatory as to deny him a fair trial. We have considered appellant's arguments on each of these issues, and finding no error requiring reversal, we affirm.

## I

In the early evening of January 31, 1978, Robert Winston, a drug dealer commonly known by his nickname, "Lobo," was shot to death in the vicinity of 14th & V Streets, N.W. During appellant's trial for that murder, a government witness testified he saw appellant fire the shot which killed Winston. The witness, Robert Harris, knew appellant by his nickname, "Spoon," and claims to have worked for him off and on as a narcotics runner[1] for six months prior to the shooting. On the evening of January 31, 1978, Harris had gone to the vicinity of 14th & V Streets to confront appellant regarding an earlier transaction in which bad drugs had allegedly been sold. Harris testified he had been talking to appellant for five minutes when they were interrupted by a third man, the decedent, Lobo. Lobo also wanted to talk to appellant about bad narcotics. Although Harris moved away from the other two at that point, he was able to overhear part of their conversation. Lobo told appellant he wanted his money back, and appellant replied that it was not his policy to give refunds. According to Harris, the conversation began to get out of hand, and appellant asked another individual nearby for a shotgun. After refreshing his recollection by refer-

---

1. A "runner" is a go-between who receives money from users and then purchases narcot-ics for them from a dealer.

ring to a statement he had previously made to police, Harris testified that appellant told Lobo to back away and then Lobo "said something and then 'Spoon' pulled out a .38 ... from [the] waistband of his pants ... and a shot was fired."[2] Harris stated there was no doubt in his mind that appellant was the one who fired the shot that killed Lobo.

Although Harris knew appellant only by his nickname, Spoon, he identified a picture of appellant on February 5, 1978. On February 13, 1979, Harris again identified appellant in a lineup picture, and, finally, at trial, Harris identified appellant as the man he saw shoot Lobo.

The defense vigorously cross-examined Harris and attacked his credibility with evidence of his prior convictions, his history of drug addiction, the fact he was on drugs the day of the shooting, that he was owed about $300 by appellant, and finally, that he did not give a report of the murder until five days after the shooting, when he was himself arrested for shoplifting. Nevertheless, Harris stood by his testimony that he had seen appellant pull the trigger.

Another government witness, Aaron McNair, was a longtime friend of the decedent, and had driven him to 14th & V on the evening he was shot. McNair testified that he waited in the car while decedent went to talk with someone. McNair did not actually see the shooting, although he heard the shot, at which point he turned and saw the person with whom decedent had been talking running towards him pointing his finger. McNair drove over to where decedent had fallen and put the severely wounded man into his car. McNair then saw a taxicab go by with three or four individuals inside, one of whom was the man he had seen talking with the decedent.

McNair drove the decedent to Howard University Hospital, where he later died from gunshot wounds. En route to the hospital, decedent, in very serious condition, mumbled a name to McNair which was not clear, but which sounded "something like

'ill' or 'Hal' or something like that." The night of the murder, McNair told the police what decedent had mumbled to him about the identity of his assailant. When the police showed him a group of photographs, McNair identified appellant as the man with whom decedent had been talking before he was shot. McNair also picked appellant out at a lineup, and identified him in court.

On cross-examination, McNair admitted that in a statement he gave to police on the night of the shooting, he said he had asked the decedent who had shot him, and the reply was "that damn Al or the damn Albert, or that damn Alfred." At trial, McNair testified he could not remember whether he had asked the decedent who had shot him or whether the decedent had spoken up on his own. On redirect, McNair stated he was certain that Winston had mumbled an "el sound." McNair had given his original statement to Officer Brigham of the District of Columbia Police Department, who testified that McNair was sure of the "el sound," but wasn't sure what name decedent had given him.

Appellant took the stand in his defense, and testified he had been a friend of the decedent for close to a year, and that they both dealt in illegal drugs. Appellant admitted he was with the decedent, on the street, at the time of the shooting. According to appellant, the decedent had summoned him down from an apartment on V street to talk about someone who was giving information to narcotics agents. Appellant testified that the decedent had told him the informer was someone named "Al." At trial appellant stated he knew who that person was.

Appellant's version of the events leading to the shooting differed from that offered by government witnesses. Appellant claimed the informer, "Al," came out of a building onto the sidewalk, at which point the decedent and appellant attracted his attention. The decedent and "Al" began

2. It was stipulated at trial that the bullet which killed decedent was fired from a .38 caliber handgun.

talking about drugs, and ended up "arguing about snitching." Decedent called"Al" a snitcher; "Al" tried to get away between two parked cars; appellant blocked his path, and decedent grabbed "Al's" arm. According to appellant, "Al" told the decedent, "If you touch me again, I'm going to kill you," and decedent responded, "You aren't going to do anything."

Although appellant testified he sensed something was going to happen at that point, he claimed his attention was distracted by a man named "Candy" who came towards him to discuss a narcotics purchase. Appellant testified he turned away from "Al" and the decedent to talk to Candy, but when he heard a shot he turned back around and saw the decedent going to the ground. He testified he saw the gun in "Al's" hand, and then ran over to "Al," flipped him to the ground and disarmed him, at which point "Al" got up, screamed an obscenity, and ran toward 14th Street. Appellant stated he then ran across the street with the murder weapon in his hand, pointing at the car driven by McNair. Then he went back to where decedent had fallen, and at that point he saw "Al" leave in a vehicle which looked like a cab.

After the shooting, according to appellant's testimony, he went to the place where decedent stayed to clear out any drugs, and then he went to Howard University and D.C. General to look for the decedent. Appellant claims he was unable to locate the decedent at Howard.

The next time appellant saw "Al" was at the Westchester County Jail in New York State, where appellant was held following his arrest for weapons offenses and violation of his New York parole. At that meeting, "Al" introduced him to bill Payne. Payne, an undercover agent for the Drug Enforcement Administration, was looking into the activities of an allegedly corrupt deputy marshal. For purposes of that investigation, Payne offered to enlist that Marshal's aid on behalf of appellant. After

the meeting, appellant found out that "Al's" real name was Freeman Mitchell.

## II

 Appellant contends that because of violations of the Interstate Agreement on Detainers (IAD) (codified at D.C. Code 1973, § 24–701; 18 U.S.C. app. p. 1395 (1976), the charges against him should have been dismissed. Specifically, appellant invokes article IV (c) & (e) of the Agreement, which provide:

(c) In respect of any proceeding made possible by this article, trial shall be commenced within one hundred and twenty days of the arrival of the prisoner in the receiving State, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.

\* \* \* \* \* \*

(e) If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's being returned to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

We may assume, as the trial court did,[3] that if appellant was entitled to the protection of the IAD, the terms of the Agreement were violated. We hold, however, that appellant was not covered by article III of the Agreement, which applies to persons who have "entered upon a term of imprisonment in a penal or correctional institution of a party state...." Plainly, that is not synonymous with being "in custody." The question raised in this case is whether article III embraces one who has been sentenced to prison, serves part of his term and is paroled, violates parole, and is later arrested on other charges at which point the state takes the first steps toward revocation of his parole.

---

3. The relevant chronology was stipulated to by the parties at the April 27, 1979, hearing on

appellant's motion to dismiss.

In *Christian v. Unites States*, D.C.App., 394 A.2d 1 (1978), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979), two defendants were incarcerated in Philadelphia jails awaiting trial on unrelated federal and state charges when they were indicted in the District of Columbia. After arraignment on the District of Columbia offenses, but before trial, they were transferred back and forth between Philadelphia and Washington several times. We rejected on two grounds their argument that the IAD required dismissal of the indictments on which their convictions were based. First, we concluded that by failing to raise the issue by motion in the trial court, they had waived any right to dismissal. Secondly, we held dismissal was not required because the circumstances of the confinement do not "comport with underlying purposes of the IAD." *Id.* at 39. The rationale for that conclusion, that the defendants had not yet "entered upon a term of imprisonment in a penal or correctional institution," is applicable to the case at bar.

The Agreement was enacted to cure the disadvantages of the detainer system inuring to sentenced prisoners who had entered the life of the institution to which they had been committed. There is nothing in the legislative history or in the Agreement itself to indicate that its provisions were intended to apply to persons who were not involved in rehabilitative programs. Article IV(e) was designed to avoid the shuttling back and forth between jurisdictions and the resulting disruptive effect such transfers would have on a consistent treatment program and to promote the speedy disposition of outstanding charges upon which the detainers were based. For these reasons, courts which have addressed the issue have recognized that a prisoner who is being temporarily incarcerated pending disposition of charges is not entitled to invoke the protections of the Agreement. [*Id.* at 40; citations omitted.]

The procedural circumstances under which each of the two defendants were incarcerated in the *Christian* case were no less convoluted than appellant's situation. One defendant, Moody, was arrested in Philadelphia in January 1973, on charges of receiving stolen goods, released on bail and again arrested in the same city in February and charged with, *inter alia*, aggravated robbery, conspiracy and threats to kill. Bail was revoked and he was committed to prison to await trial on both offenses. In September, he was convicted in a bench trial on the stolen goods charge and sentenced to 6–23 months. When he appealed from that conviction, under Pennsylvania law he was entitled to a jury trial de novo,[4] and his sentence was arrested. According to prison records, he was "discharged" from his sentence but remained in custody pending a new trial and a trial of the second set of offenses. Consequently, we determined that he was a "pretrial detainee" at the time he was transferred to the District of Columbia.

The second defendant, Clark, was released from federal penitentiary in November 1972, on bond pending appeal of a 15-year sentence for bank robbery. In March of 1973, he was arrested on other bank robbery charges and held in the Philadelphia Detention Center pending trial. Four days later the 1972 federal conviction was affirmed. At the time Clark was transferred to the District of Columbia, he was in the Philadelphia Detention Center "only to await trial on his outstanding bank robbery charges." His federal appeal having failed, it was inevitable that he would eventually be returned to a federal penitentiary for service of his sentence.

Nonetheless, we held the transfers of Moody and Clark were not the sort of disruption of institutional life to which the IAD is addressed. Similarly, we reject the contention that appellant's status as a prisoner awaiting final proceedings on revocation of parole brought him within the protection of the IAD. There had not yet been final revocation of parole. Even if he

---

4. 17 Pa. Stat. Ann. § 711.18 (Purdon Supp. 1977).

lacked any defense to the alleged parole violations, and revocation was a virtual certainty, just like Clark, who would inevitably be sent to a federal prison to serve a definite sentence, appellant had not yet entered into the life of the institution to which he would be committed at the time he was brought to the District of Columbia;[5] and so his progress in any institutional programs of rehabilitation could not have been interrupted.

We note that the Third Circuit Court of Appeals reached this same conclusion in *United States v. Dobson*, 3rd Cir., 585 F.2d 55, *cert. denied*, 439 U.S. 899, 99 S.Ct. 264, 58 L.Ed.2d 247 (1978), where a federal detainer was lodged against a parole violator detainee prior to any parole revocation hearing. The court recognized that even though,

> the basis for the parolee's detention is the underlying sentence from which he had been paroled, until such time as the parole violator is recommitted after a hearing, and his incarceration thereby made certain and fixed as to duration, no term of imprisonment can be said to have commenced or resumed. In this respect a parole violator is no different than a pretrial detainee who is merely awaiting trial and who, until conviction and sentencing, cannot commence service of a term of imprisonment. [*Id.* at 59.][6]

5. Under New York law, a preliminary parole revocation hearing must be held within 15 days of the execution of a parole revocation warrant, and within another 90 days there must be a final hearing. The New York Court of Appeals recently held that state parole officials can presumptively meet these statutory deadlines even where the violator is imprisoned in another state. *Gonzales v. Dalsheim*, 52 N.Y.2d 9, 417 N.E.2d 493 (1980). Hence, appellant's transfer to the District of Columbia need not have necessarily impaired his right to a prompt disposition of the parole revocation proceedings in New York, and so the transfer did not disrupt that aspect of his New York confinement.

6. The court in Dobson points out the unanimous refusal of courts, both state and federal, to extend the agreement to reach detainees awaiting trial. *Id* at 59. To their list we add *United States v. Reed*, 620 F.2d 709, 711 (9th Cir.), *cert. denied*, 449 U.S. 880, 101 S.Ct. 229,

We are persuaded that the contrary construction of the IAD urged by appellant would in no way advance the purposes of the Agreement. Therefore, we reject his contention that the indictment should have been dismissed.

### III

■ Appellant's next argument concerns the admission into evidence of his prior convictions for the purpose of impeaching his credibility. D.C. Code 1973, § 14–305, provides in pertinent part:

> (b)(1) Except as provided in paragraph (2), for the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a criminal offense *shall be admitted if offered*, either upon the cross-examination of the witness or by evidence aliunde, but only if the criminal offense (A) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, or (B) involved dishonesty or false statement (regardless of punishment). A party establishing conviction by means of cross-examination shall not be bound by the witness' answers as to matters relating to the conviction. [Emphasis added.]

We held in *Dixon v. United States*, D.C. App., 287 A.2d 89, *cert. denied*, 407 U.S. 926, 92 S.Ct. 2474, 32 L.Ed.2d 813 (1972), that the statute, as amended by Congress in

66 L.Ed.2d 104 (1980) (in custody awaiting trial on state and federal charges and awaiting revocation of parole arising out of earlier state conviction); *United States v. Milhollan*, 599 F.2d 518, 528 (3rd Cir.), *cert. denied*, 444 U.S. 909, 100 S.Ct. 221, 62 L.Ed.2d 144 (1979) (pretrial detainee); *People v. Pratt*, 161 Cal.Rptr. 523 (Dist. Ct. App. 1980) (IAD does not encompass state defendant who has yet to commence prison term and who is in holding facility detained by federal authorities pending federal parole revocation hearing); *Commonwealth v. Kesting*, 274 Pa.Super. 79, 417 A.2d 1262 (1980) (pretrial detainee not within IAD protection); *Commonwealth v. Hude*, 483 Pa. 489, 397 A.2d 772 (1979) (IAD not applicable to one incarcerated awaiting trial); *State v. Looze*, 273 N.W.2d 177, 179 (S.D. 1979) (IAD not applicable to defendant who is merely a detainee in county jail awaiting transfer to federal authorities to answer to charges of escape).

1970,[7] did not violate either the Fifth or Sixth Amendment rights to a fair trial by an impartial jury. This holding was reaffirmed in *Davis v. United States*, D.C.App., 313 A.2d 884 (1974), and we have not wavered since. Appellant apparently does not accept the theoretical underpinnings of the rule contained in D.C. Code 1973, § 14–305. We are aware of the debate among courts and within academia about the wisdom of informing juries of a defendant's prior convictions when a defendant takes the stand, given the possibility that even with a cautionary instruction the jurors may not confine their consideration of the prior convictions to the question of credibility. Nonetheless, the issue comes down to one of policy, and the Congress had left no doubt that in this jurisdiction, our policy is that when a defendant takes the stand the court must permit the prosecution to attack his or her credibility by introducing recent prior convictions for felonies and other crimes involving dishonesty or false statement. That being the settled rule, we reject appellant's second allegation of error.

## IV

■ At trial, appellant admitted he was present at the scene of the crime; his defense was that the murder was committed by someone else. During cross-examination by the government, appellant was asked about a conversation which took place at the Westchester County Jail, on April 8, 1978, after a criminal complaint had been filed against him in the District of Columbia, but before indictment or arraignment. The participants in that conversation were appellant, an undercover agent of the Drug Enforcement Administration named William Payne, and Freeman Mitchell, whom appellant claimed at trial was the real murderer. For Payne, the purpose of the meeting was to enlist appellant's unknowing assistance in an investigatory scheme aimed at a deputy marshal who was suspected of accepting bribes in return for rendering assistance to persons in custody facing criminal charges. Payne did not disclose his true identity or purpose to appellant, but did inform him the marshal might be able to help out on the New York charges. Payne instructed appellant that in case he was asked how they were acquainted, he was to tell the marshal that Payne was his cousin.

Freeman Mitchell, who was responsible for setting up the meeting, was, unbeknownst to appellant, also a government informant. Before the meeting, Mitchell had told appellant that Billy Payne knew a deputy marshall who could help him. Appellant claims he was also told he could expect help with the District of Columbia charges, although that was disputed at trial. Mitchell did tell appellant that if Payne asked about the District of Columbia murder, appellant could tell Payne he had been with Mitchell at a party at the time the murder occurred. Appellant made a statement to that effect during his conversation with Payne.

Appellant moved pretrial to prevent introduction into evidence of the alibi he gave Payne. His motion was denied, and the government was permitted to impeach him by confronting him with his prior alibi during cross-examination.[8] Appellant argues

---

7. In *Luck v. United States*, 121 U.S.App.D.C. 151, 156, 348 F.2d 763, 768 (1965), the circuit court held a trial court was *not required* by the then applicable statute, D.C. Code 1967, § 14–305 "... to allow impeachment *every time* a defendant takes the stand in his own defense." (Emphasis added.) The court went on to explain that in certain circumstances a trial court might exercise its discretion to bar altogether the government from impeaching or limit the number of prior convictions used for impeachment. *See Dixon v. United States, supra* at 91 n.1. The so-called *Luck* rule was circumscribed by the amendment of the statute in 1970, which expressly deprived trial courts of

discretion to limit impeachment by prior convictions.

8. Q. Now, you saw Big Al again in April, up in Westchester County Jail?
A. Yes, I did.
Q. And at that time he was there with a guy named Bill Payne?
A. Yes, he was.
Q. And you were talking with Payne about the murder charge, right?
A. Yes, I was.
Q. And you told Payne that, on the night of the murder, you were at a party with the man that was sitting next to him, Big Al?

that was error because the statement was obtained in violation of his Sixth Amendment right to counsel, and because the statement was not voluntarily made.

We cannot praise the decision by a federal agent to attempt to use appellant as an unwitting pawn in an unrelated criminal investigation at the same time appellant was in custody, facing serious charges in New York and the prospect of an indictment for murder in Washington. Not only was there a risk of infringing upon appellant's constitutional right to a fair trial, it also potentially jeopardized the public's interest in prosecuting appellant for the serious crimes for which he would be charged.[9] However, in this appeal, our task is not to review the wisdom of what the government agent did, but to determine whether the prosecution's use, for impeachment purposes, of statements made by appellant in his conversion with Payne, deprived appellant of any right secured to him by the federal Constitution, and whether his conviction can be upheld as valid in these circumstances.

In *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the Supreme Court first held the right to counsel guaranteed to the accused by the Sixth Amendment was violated where there was used at trial evidence of the defendant's own incriminating words which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel. *Id.* at 206, 84 S.Ct. at 1203. The Supreme Court most recently addressed the *Massiah* rule in *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), in which they held the Sixth Amendment was violated where government agents had instructed a cellmate of the accused to "be alert to any statements ... but not to initiate any conversation with or question Henry regarding the bank robbery." *Id.* at 266, 100 S.Ct. at 2184. After his release, the cellmate relayed details of the bank robbery to the agents and testified against the accused at trial. The cellmate-informant was paid for his role, although the jury was not told of that, and Henry himself did not learn of the arrangement until after he had exhausted his direct appeal rights. The Supreme Court affirmed the holding of the court of appeals that Henry was entitled to relief under 28 U.S.C. § 2255.

The Massiah rule, without a doubt, retains its vitality today. However, by its own terms the rule applies only to post-indictment confrontations between the accused and government agents. *Massiah v. United States, supra* at 204, 84 S.Ct. at 1201; *see Powell v. Alabama*, 287 U.S. 45, 57, 53 S.Ct. 55, 59, 77 L.Ed. 158 (1932); *Government of Canal Zone v. Sierra*, 594 F.2d 60, 67 (5th Cir. 1979). Although judicial proceedings had begun against appellant in New York State at the time he met with Agent Payne in the Westchester County Jail, for our purposes the critical difference between this case and *Massiah, Henry* and the cases in between, is that appellant

A. Yes.
Q. You told him that?
A. Yes.
Q. And now you are sitting here telling us Big Al did it?
A. Yes.
Q. Well, is what you told Payne accurate or is what you are telling us today accurate?
A. What I am telling you today is accurate.
Q. Why didn't you tell Payne that?
A. Because when I got on the phone, Al told me it's a person there to help me, you know, my D.C. charges, and I told him, I said, you know what's happening, right? He said, just keep your mouth shut and the man will help you. I said, what he going to do? He said, if he asks you anything, just say you was with me.

Q. Big Al told you that?
A. He told me.
Q. So you lied to Payne?
A. You said I lied to Payne. The man was going to help me.
Q. Did you lie to Payne?
A. Yes, I did.

9. In *Morrison v. United States*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981), the Supreme Court warned that in some cases it may be appropriate to order dismissal of an indictment where government agents interfere with the right to counsel and there is a showing of some adverse consequence to the representation received or the fairness of the proceedings leading to conviction.

had not yet been formally charged in the District of Columbia at the time he met with Agent Payne. *Cf. Brewer v. Williams*, 430 U.S. 387, 399, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1977) (judicial proceedings had been initiated where arrest warrant had issued, arraignment held before judge, and defendant committed by court to confinement in jail).

■ In concluding the *Massiah* rule does not apply in this case, we need not simply rest our decision on the fact appellant was not yet indicted, for even if he had been, the rule would not apply. Agent Payne's meeting with appellant was not a deliberate attempt to elicit incriminating evidence to be used against appellant. In fact, according to Payne's testimony, he was not even aware of the murder charge until appellant himself brought up the subject. Payne never contacted the officers who were investigating Winston's murder, and was only informed that appellant was charged with the murder when defense counsel contacted him one month before trial.[10] In *United States v. Garcia*, 377 F.2d 321, 324 (2d Cir.), *cert. denied*, 389 U.S. 991, 88 S.Ct. 489, 19 L.Ed.2d 484 (1967), incriminating statements were made to a federal officer *after* the defendant had been indicted, yet it was held there was no violation of the *Massiah* rule when those statements were admitted at trial, because the rule:

> ... [does not] apply in a case in which the questioner was completely unaware of the existence of the indictment and was not seeking information about the crime the indictment charged had been committed ... certainly in a case like this where the agent is unaware of the crime under indictment, he cannot be said to be deliberately eliciting a statement in violation of *Massiah*. [*Id.* at 324; citations omitted.]

Since Massiah bars the use of only those statements deliberately elicited by the

government in their investigation of the crime, the rule does not apply in this case to prohibit introduction of appellant's statement to Payne. *United States v. Garcia, supra; Wilson v. Henderson*, 584 F.2d 1185, 1191 (2d Cir. 1978), *cert. denied*, 442 U.S. 945, 99 S.Ct. 2892, 61 L.Ed.2d 316 (1979); *United States v. Hinton*, 543 F.2d 1002, 1016 (2d Cir. 1976), *cert. denied*, 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977); *Grieco v. Meachum*, 533 F.2d 713, 718 (1st Cir.), *cert. denied*, 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135 (1976).

■ Appellant also contends introduction of this evidence should not have been permitted because his statement to Agent Payne was involuntary, and therefore *any* use of it at trial would violate his Fifth Amendment right against self-incrimination. *New Jersey v. Portash*, 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979); *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978). The basis for this argument is that Agent Payne, either directly or impliedly, promised to assist appellant in obtaining a favorable resolution of the charges he faced. Two facts are significant in our analysis of this issue. First, Agent Payne was investigating the deputy marshal and not appellant, and second, appellant was not required to meet with Payne. He did so voluntarily. Mitchell told appellant that Payne knew someone who might help him, but appellant was not obliged to speak to Payne at all. It was only appellant's willingness to discuss extra-legal methods for resolving the charges against him that led to the meeting with Payne. We are not persuaded that appellant's statement was in any sense "compelled." [11]

The government, citing *Ibn-Tamas v. United States*, D.C.App., 407 A.2d 626 (1979), asserts that even if we were to decide the statement was obtained in violation of appellant's constitutional rights, its use

---

**10.** Official reports filed by Payne after the April 8, 1978, meeting do not even mention any discussion of the murder.

**11.** See *Hoffa v. United States*, 385 U.S. 293, 303–10, 87 S.Ct. 408, 414–417, 17 L.Ed.2d 374

(1966) (statements overheard by government informer who was not surreptitious eavesdropper but who was in defendant's hotel suite by invitation).

for impeachment purposes would not be barred. *See Oregon v. Haass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). Since our reasoning in this case, that *Massiah* was not violated, is not limited to impeachment use only, we do not presume to decide whether statements arguably obtained in violation of the Sixth Amendment may nonetheless be admitted for impeachment. See *Hall v. State*, 47 Md.App. 590, 425 A.2d 227 (1981).

## V

 Appellant finally argues his conviction must be reversed because of improprieties in the prosecutor's closing argument. Specifically, the prosecutor told the jury the testimony of the government's witness, Harris, was especially credible since Harris chose to testify against appellant even though he was convinced that by doing so he faced "certain death." Appellant challenges that remark as improper because it was inflammatory and did not fairly reflect the evidence. However, it has been held that an honest misinterpretation of testimony, without some indication of prejudice, does not constitute reversible error. *King v. United States*, 125 U.S.App.D.C. 318, 330, 372 F.2d 383, 395 (1967); *Nicholson v. United States*, 221 F.2d 281 (8th Cir. 1955). The prosecutor's remarks in this case are a far cry from the persistent "unsupported, general assertions" which compelled reversal in *King v. United States, supra*. Furthermore, the trial court's careful instructions mitigated the potential for prejudice which the prosecutor's remarks might have caused. On balance, we are also persuaded none of the other remarks alleged to be improper constitute grounds for reversal. *Reed v. United States*, D.C.App., 403 A.2d 725 (1979). Therefore the judgment is

*Affirmed.*

MACK, J., concurs in the result only.