**Joseph F. WILSON, Jr., Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 80–1392.**

District of Columbia Court of Appeals.

Argued Dec. 15, 1981.

Decided March 25, 1982.

John W. Sansing, Washington, D. C., for appellant.

Marc B. Tucker, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Washington, D. C., at the time the case was briefed and argued, John A. Terry, Michael W. Farrell, and David W. Stanley, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KELLY, MACK and PRYOR, Associate Judges.

MACK, Associate Judge:

This is an appeal from a conviction of accessory after the fact to felony murder (kidnapping) (D.C.Code 1973, § 22–106). The appellant contends that an inculpatory statement he made should have been suppressed because the two detectives who transported him from the Arlington County Jail to the District for processing and then to the Superior Court honored neither 1) his Fifth Amendment (*Miranda*) right to remain silent nor 2) his Sixth Amendment right to counsel. This statement, "[in] particular[ ]," later formed the basis of the appellant's conviction after a stipulated trial. Brief for Appellee at 7.[1] We agree with the appellant that the detectives failed to "scrupulously honor" his right to remain silent and reverse.

The appellant was arrested at Fort Myer, Virginia about 9:30 a. m. on July 13, 1978 by a military policeman. The policeman, whose sole responsibility was to transfer the appellant to public authorities, read appellant's rights to him and did not question him. He did not ask the appellant to sign a *Miranda* waiver card.

The appellant spent that night at the Arlington County Jail. The next morning, at approximately 11:00, two District Homicide Detectives, Aduddell and Chaney, arrived to transport him back to the District. At the hearing on the motion to suppress, Detective Aduddell testified that he recited the appellant's *Miranda* rights to him while in Arlington and that the appellant said he understood them.[2] He also testified, how-

---

1. The stipulated trial was the appellant's second trial arising out of the same occurrence. It is a ruling by the judge in the first trial denying the appellant's motion to suppress which he is challenging.

2. At the hearing, two other officers testified that they had arrested the appellant previously, on March 30, 1978 and April 4, 1978; and that on both occasions he was read his rights, understood them and signed waiver cards, once

ever, that, when questioned, the appellant said he had "nothing to tell," other than to "den[y] his present [sic] at the time of the offense." The detective also testified that the appellant was "curious" as to how they had gotten his name and that they told the appellant that a witness to the alleged offense had made a statement implicating him. Further, Detective Aduddell testified that he, Detective Chaney and the appellant continued to discuss the case during their drive back to the District.

When the detectives and the appellant arrived at the District's Homicide Office, the officers again verbally advised appellant of his rights. Detective Aduddell testified that the appellant did not waive his rights and that he and Detective Chaney continued to discuss the case and the evidence against the appellant with him and to respond to his questions. He also testified that he and Detective Chaney had earlier discussed the possible efficacy of providing the appellant with increasingly more specific information regarding his alleged offense. On cross-examination, Detective Aduddell continued:

Q. And your prior discussion with Detective Chaney about whether or not to talk to him further, in those discussions, was there any indications of what might be your purpose in revealing such information?

A. We felt if we were more specific, perhaps Mr. Wilson would decide to change his mind and give us a statement.

Q. You were working in effect on Mr. Wilson, to abandon the—to induce Mr. Wilson to abandon the—his position of the exercise of his rights?

A. I don't like the terminology, but I'll say yes.

Q. It was a deliberate strategy, was it not?

A. It would say it was deliberate only that he initiated the questions of us.

waiving all his rights, the other time retaining the right not to answer questions.

3. Detective Addudell also testified that earlier in their discussion they had told the appellant that if he gave a statement they would help him get released on personal recognizance and that

After the appellant was processed, Detectives Aduddell and Chaney took him by car to the Superior Court cellblock. Detective Aduddell testified that as he was pulling into the entrance of the court the appellant asked him to stop and again inquired about the evidence that had implicated him. It was at that point that the detectives told him the name of the witness—a friend of his and a witness to the murder, Linda Baldwin. Detective Aduddell described the appellant's reaction as "flabbergasted. He couldn't believe it." Thereafter, the detectives and the appellant talked for "a couple of minutes" during which the detectives told him that it would be in his interest to make a truthful statement.[3] He then agreed to give a statement which was executed between 12:30 and 2:30 that afternoon.

I.

Our Fifth Amendment analysis begins with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The Court there held that a suspect in police custody must be informed that he has the right to remain silent; that anything he says can and will be used against him in court; that he has the right to consult with and to the presence of counsel during interrogation and that, if he is indigent, a lawyer will be appointed to represent him. The familiar *Miranda* warnings are the prophylactic safeguard assuring at least a notice of these rights.

The question here, however, is not whether the appellant was advised of his rights but, rather, whether he had invoked his right to remain silent and, if so, whether the detectives failed to "scrupulously honor," *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), that right by continuing to "interrogate" him. If we

the promise was a "calculated inducement" to convince him to make a statement. The detective noted, however, that it was the appellant who initiated the discussion of the possible conditions of his pretrial release.

find that the detectives scrupulously honored that right we must then look to whether the appellant "intentionally relinquish[ed] or abandon[ed]" his right to remain silent. *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *United States v. Alexander*, D.C. App., 428 A.2d 42, 48–49 n.19, 52 n.27 (1981).

The trial court found that appellant invoked his right to remain silent, both in Arlington when he said he had "nothing to tell" and later at the Homicide Office. Finding that conclusion to have been supported by substantial evidence, we affirm it. D.C.Code 1973, § 17–305(a).

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda v. Arizona, supra* 384 U.S. at 473–74, 86 S.Ct. at 1627. The next question we must address, therefore, is whether the detectives' continuing discussions with the appellant after his invocation of his right to remain silent amounted to "interrogation." We hold that they did under the teachings of *Rhode Island v. Innis*, 446 U.S. 291, 300–02, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980).[4]

At the suppression hearing, Detective Aduddell admitted that his and Detective Chaney's intent in engaging the appellant in conversation was to induce his statement. While this alone is not dispositive under *Innis*,[5] the Court there did stress that the definition of interrogation extends to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response. As such, the intent of the police in *Innis* was "not . . . irrelevant"; in fact, the Court

concluded, "where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." *Id.* at 301–02 n.7, 100 S.Ct. at 1690 n.7.

While the Court in *Innis* failed to hold that an interrogation had taken place, it did so on the basis that, given the circumstances surrounding the respondent's statements,[6] the police should not have known that the suspect would be moved to make an incriminatory response. *Id.* at 302–03, 100 S.Ct. at 1690–91. Such was not the case here as Detective Aduddell testified regarding his and Detective Chaney's agreed-upon plan and intent to comment so as to elicit exactly the type of incriminating statement which the appellant eventually made.

This court adopted the *Innis* test in *United States v. Alexander, supra*, a case not unlike this one in that there, too, a detective, after Alexander had asserted her right to counsel, made statements to her and used "techniques" which, he later admitted, were designed to elicit inculpating statements. *Id.* at 51. There we held that the detective's admission "conclusively demonstrat[ed]" that he did not "scrupulously honor" the suspect's right not to be interrogated and reversed the trial judge's ruling that she was not interrogated within the meaning of *Miranda. Accord, Robertson v. United States*, D.C.App., 429 A.2d 192 (1981).

While our finding here that the detectives continued to interrogate the appellant after he invoked his right to remain silent goes far toward a conclusion that they did not "scrupulously honor" the appellant's

---

4. The trial court noted that the discussions at issue were not "lengthy interrogations" but did not specify whether the discussions constituted an "interrogation" in the first instance.

5. The Court stated that the test for determining whether the police have interrogated a suspect is not the intent of the police but primarily the perceptions of the suspect. *Id.* 446 U.S. at 301, 100 S.Ct. at 1689.

6. The Court described the conversation between the police which apparently provoked Innis' statement as "consist[ing] of no more than a few offhand remarks . . . ." *Id.* at 303, 100 S.Ct. at 1691. In *United States v. Alexander, supra* at 51, we described that same conversation as "a casual remark from one officer to another in the presence of the defendant . . . ."

rights, we nonetheless must look to the strictures of *Michigan v. Mosley, supra,* to determine, ultimately, whether the appellant's Fifth Amendment rights were violated.

We are met, at the outset, with the trial court's finding of no Fifth or Sixth Amendment violations in that the detectives did not overbear the appellant's will nor improperly induce his statement, but, rather, that the appellant voluntarily gave a statement and, in fact, initiated the conversation himself.[7] In reviewing a court's denial of a motion to suppress we may not disturb its factual findings so long as they are supported by substantial evidence. D.C.Code 1973, § 17–305(a). On the facts of this case, we conclude, as a matter of law, that the appellant's rights were not scrupulously honored and, as such, *Miranda, supra,* and *Mosley, supra,* require the exclusion of his statement.

In *Mosley,* the Court noted the factors which are to be considered in determining whether a suspect's right to cut off questioning has been scrupulously honored. They are: 1) was the suspect advised of his rights and did he orally acknowledge them; 2) did the police immediately cease questioning and make no attempts to resume or ask him to reconsider; 3) was there a two hour break between the first and second interrogations and was the second performed at a different location by a different officer about a different crime and 4) were *Miranda* warnings given before the second questioning session. The Court in *Mosley* answered all these questions in the affirmative and vacated the Michigan Court of Appeals' reversal of the respondent's conviction.

While the appellant here was repeatedly advised and acknowledged his understanding of his *Miranda* rights those rights were, nonetheless, not scrupulously honored under the second and third factors which *Mosley* set as guidelines. Here, the detectives did not immediately cease questioning the appellant. Instead, they persistently and consistently interrogated him intending to elicit incriminatory statements. Also, the government failed to satisfy *Mosley's* third prong. The same detectives engaged the appellant in conversation regarding the same crimes virtually throughout their four hours together, the only break apparently occurring during the routine processing procedure which, as we have recognized, can also be the "functional equivalent of 'interrogation.'" *United States v. Alexander, supra* at 51. Lastly, although the scenes of the interrogations did change, those changes did not ease the potentially coercive atmosphere surrounding the interrogations. Rather, the locations became increasingly more coercive such that the appellant was at the court house door before he decided to make a statement. Therefore, given the detectives' failure to provide the appellant with sufficient *Mosley* safeguards, we find that his rights were not "scrupulously honored" by those detectives. *Cf. Calaway v. United States,* D.C.App., 408 A.2d 1220 (1979) (suspect continued to speak despite consistent warnings by the police); *Peoples v. United States,* D.C.App., 395 A.2d 41 (1978), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2826, 61 L.Ed.2d 277 (1979) (suspect signed a confession six hours after a previous interrogation and after he had been taken before a judicial officer who, along with the detective who took the statement, gave him fresh *Miranda* warnings).

7. The government, on appeal, argued that there was no constitutional defect here since the appellant initiated the relevant discussion. While the record is unclear as to whether the appellant's "curiosity" was piqued initially as a result of the detectives having told him about the existence of an unnamed witness to the alleged crime or the detectives having told him of the witness was a result of the appellant's questioning, it is not crucial here. In light of the detectives' deliberate and ultimately successful attempts to induce the appellant's incrimina- tory statement, our finding that their attempts amounted to an interrogation and our conclusion that the detectives failed to scrupulously honor the appellant's Fifth Amendment rights, it would be inconsistent for us to hold that the appellant independently and insistently initiated, nurtured and guided the discussions. *Cf. Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (petitioner subjected to interrogation at the instance of police after invoking his right to counsel).

Since we so find, we also conclude that the appellant's statement did not amount to an intentional relinquishment or abandonment of a known right or privilege for Fifth Amendment purposes and that it should have been suppressed. *United States v. Alexander, supra* at 52.

## II.

■ The trial court also ruled that the appellant's Sixth Amendment right to have counsel present during interrogation was not abridged. We agree. The appellant had not been formally charged, indicted or arraigned at the time of his incriminatory statement. Hence, under our recent decision in *Hill v. United States*, D.C.App., 434 A.2d 422 (1981), in which we held that the Sixth Amendment right to counsel "applies only to post-indictment confrontations between the accused and government agents," the appellant's right to counsel had not yet attached. *Id.* at 430, *citing Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).[8] *See also Brewer v. Williams*, 430 U.S. 387, 398–99, 97 S.Ct. 1232, 1239–40, 51 L.Ed.2d 424 (1977), (the Sixth Amendment right to counsel had attached in a case in which an arrest warrant had issued and the defendant had been arraigned and confined to jail by a court). We therefore affirm the trial court's finding in this respect.

In view of our conclusion that the statement introduced into evidence was obtained in violation of the Fifth Amendment, the judgment appealed from is

*Reversed.*

PRYOR, Associate Judge, dissenting:

This case requires us to consider again, pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the balance between the right against self-incrimination and society's interest in law enforcement. The specific question in this instance is whether appellant's statement, after initially electing to remain silent, was the consequence of interrogation or the equivalent thereof.

## I

Appellant, a member of the armed forces stationed at Fort Myer, Virginia, was the subject of an arrest warrant issued in this jurisdiction. He was arrested by a military policeman, warned of his right to remain silent and to consult counsel, and transferred to the custody of Arlington County police authorities. The latter also advised him of his right not to answer questions. The next day, two detectives from the Metropolitan Police Department arrived at the Arlington County Jail; they apprised appellant of the nature of the charges against him and repeated the *Miranda* warnings. Appellant indicated that he would make no statement but "was curious as to how [the police] got his name for the arrest." This inquiry was answered generally. In the course of the next few hours, appellant was transported to the District's Homicide Office, again advised of his rights, photographed and prepared for court. En route to the Superior Court, appellant "asked us again about the evidence that implicated him in the murder...." Whereas previous reference had been to an unnamed witness, the officers then disclosed the name of a particular witness, having in mind, that the information might cause the subject to change his mind and give a statement.

Upon hearing the name of the person who implicated him, appellant indicated that he wished to state his version of the incident. After returning to police headquarters, and being apprised that any statement could be used against him, appellant gave a written statement which was used against him at trial.

## II

We start with the premise that when a suspect to a crime asserts the right to remain silent, that decision must be scrupu-

---

8. The appellant admits that he at no time during his custodial interrogation requested the assistance of counsel. Hence, we need not address the question of whether he was denied his Fifth Amendment right to counsel.

lously honored and such a person, without more, may not be interrogated against his will. A brief summary of the Supreme Court's decisions in this regard is helpful.

In *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), Mosley, a robbery suspect, was arrested and warned of his right to remain silent; he chose not to answer questions. Some hours later, a homicide detective learned that he was in custody and sought to question him about an unrelated murder. After being advised of his rights by the second detective, Mosley acknowledged that he understood but nonetheless gave a statement.

In upholding the prosecution's use of the statement at trial, the Court observed that a suspect's initial decision not to answer questions does not create a per se proscription against all further questioning. The decision not to answer questions must be scrupulously honored but that circumstance may change:

\* \* \* \* \* \*

Although a recently arrested individual may have indicated a desire not to answer questions, he would nonetheless want to know immediately—if it were true—that his ability to explain a particular incriminating fact or to supply an alibi for a particular time period would result in his immediate release. Similarly, he might wish to know—if it were true—that (1) the case against him was unusually strong and that (2) his immediate cooperation with the authorities in the apprehension and conviction of others or in the recovery of property would redound to his benefit in the form of a reduced charge. Certainly the individual's lawyer, if he had one, would be inter-

ested in such information, even if communication of such information followed closely on an assertion of the "right to silence." Where the individual has not requested counsel and has chosen instead to make his own decisions regarding his conversations with the authorities, he should not be deprived even temporarily of the information relevant to the decision. [*Id.* at 109 n.1, 96 S.Ct. at 329 n.1; (White, J., concurring).]

In *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), Williams, a suspect in the death of a young girl, was taken into custody in Davenport, Iowa. After receiving the *Miranda* warnings, he appeared in court and was advised by counsel to remain silent. By arrangement with the police, it was agreed that Williams would be transported by automobile to Des Moines but would not be interrogated by the escorting officers. During the two and one-half hour ride, one of the officers, a Detective Leaming, spoke to Williams in a manner that has been described as the "Christian burial speech." [1] At a later point, Williams directed the officers to the body of the girl.

In deciding the case, the Court was explicit in ruling that it was reversing the conviction because of the violation of the right to counsel rather than on *Miranda* grounds.

In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), Innis was arrested at an early hour in the morning on the streets of Providence in connection with the shotgun death of a taxicab driver. After being warned of his rights by three different officers of ascending rank, he was placed in a transport vehicle. As the vehi-

---

1. I want to give you something to think about while we're traveling down the road.... Number one, I want you to observe the weather conditions, it's raining, it's sleeting, it's freezing, driving is very treacherous, visibility is poor, it's going to be dark early this evening. They are predicting several inches of snow for tonight, and I feel that you yourself are the only person that knows where this little girl's body is, that you yourself have only been there once, and if you get a snow on top of it you yourself may be unable to find it. And, since we will be going right past the area on the way into Des Moines, I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas [E]ve and murdered. And I feel we should stop and locate it on the way in rather than waiting until morning and trying to come back out after a snow storm and possibly not being able to find it at all. [*Id.* at 392–93, 97 S.Ct. at 1236–37].

cle was driven to the police station, there was conversation among the three officers—within hearing of the suspect—to the effect that an abandoned shotgun would pose a considerable threat to school children.[2] Innis interrupted, and directed the officers to the weapon.

Applying the previously declared standards, the Court held that the suspect had not been interrogated and that the statements were admissible evidence against him.

Finally, in *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), Edwards was arrested for a robbery culminating in a death. After being warned of his rights, he discussed the possibility of a "deal" but ultimately decided that he wanted a lawyer to accomplish this for him. The conversation ended; but the next morning Edwards was told that he was required to see two other officers who had come to the jail especially to see him. After a new *Miranda* warning, a taped statement of an accomplice implicating Edwards was played. Upon hearing it, Edwards made a statement but declined to have it recorded. The statement was used at trial.

In reversing the conviction, it was held that, under the circumstances presented, the accused had not waived his right to counsel and therefore should not have been questioned a second time by the police.

Returning to this case, the critical inquiry, I think, is whether appellant's statement was the consequence of direct questioning or of an impermissible equivalent of interrogation. In light of the decisions just reviewed, the argument advanced by appellant causes me to pause. Essentially, appellant contends that because the police answered appellant's questions in a piecemeal, increasingly specific manner, with the hope that this approach would induce a statement from him, that such conduct was the "functional equivalent of interrogation."

Certainly an emotional and lengthy statement directed to a suspect in custody, as in *Brewer v. Williams, supra,* can rightly be reviewed as "interrogation" which is violative of the expressed right of the accused to remain silent. Similarly, the initiation and insistent questioning of an arrestee who has declined to answer questions, is improper. *See Edwards, supra.* Significantly, the cross-talk among officers respecting the missing weapon in *Innis* clearly bore the police hope that the suspect would reconsider his decision to be silent and respond in some way. Notwithstanding this factor, the Court did not hold the police statements to be the functional equivalent of interrogation.

Appellant's argument in this case must mean that, after having had numerous warnings about the right to remain silent, the failure of the police to answer appellant's questions in an immediate and exhaustive fashion, was, in itself, an impermissible form of interrogation.[3]

In my view, appellant has not shown that he was "interrogated" in this instance or

---

**2.** One of the officers testified:

> At this point, I was talking back and forth with Patrolman McKenna stating that I frequent this area while on patrol and [that because a school for handicapped children is located nearby,] there's a lot of handicapped children running around in this area, and God forbid one of them might find a weapon with shells and they might hurt themselves. [*Id.* at 294–95, 100 S.Ct. at 1686–87].

**3.** Appellant understandably places some reliance on our decision in *United States v. Alexander,* D.C.App., 428 A.2d 42 (1981). There a suspect in a homicide investigation who was advised of her rights, indicated that she did not wish to answer questions without first having the advice of a lawyer. A few minutes later, the same detective, who had earlier given the *Miranda* warnings, stated, "we know what happened" or "we know you are responsible for the stabbing." Still later, the officer advised the arrestee that he would need certain routine information from her in order to transfer her to the jail. She, thereupon, without further warnings, began to relate her version of the events which had occurred.

Concluding that the proffered statement was inadmissible, we emphasized that appellant had asserted the right to consult with counsel, but that the officer had nonetheless initiated a further discussion of the case and, without any new warnings, obtained an incriminating statement. That analysis, in my view, is not persuasive, under the circumstances of this case.

coerced into giving a statement.[4] The holding which he seeks would, I think, be tantamount to a per se rule which both the Supreme Court and this court have previously rejected.

Accordingly, I dissent.

---

4. The trial judge specifically found that appellant "was able to and did in fact freely and voluntarily waive his rights in ... giving a statement."