James F. McCLINNAHAN, Appellant,

v.

UNITED STATES, Appellee.

No. 81–709.

District of Columbia Court of Appeals.

Argued May 18, 1982.
Decided Dec. 30, 1982.

Norman T. Townsend, Alexandria, Va., appointed by this court, for appellant.

Margaret P. Spencer, Asst. U.S. Atty., with whom Stanley S. Harris, U.S. Atty., John A. Terry, Asst. U.S. Atty., at the time brief was filed, Michael W. Farrell and E. Thomas Roberts, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before KERN, FERREN and PRYOR, Associate Judges.

KERN, Associate Judge:

The trial court sitting without a jury found appellant guilty of felony murder while armed, of premeditated murder while armed, and of other related offenses arising out of his fatally stabbing the victim during an attempted robbery in her apartment at 1401 Fairmont St., N.W.[1]

The prosecution evidence consisted of an identification on the scene minutes after the crime by an eyewitness who was visiting the decedent in her apartment at the time appellant entered it and demanded money; an observation of appellant running from the apartment building by one of the police officers responding to the scene at the call of the eyewitness (who had managed to escape from the apartment of the deceased prior to the murder); the fact that the blood on appellant's clothing at the time of his arrest matched the blood of the murdered victim; and, a confession by appellant a few hours after his arrest during which time he first had confessed to murdering two other women one year earlier in a double homicide unrelated to the instant case.

Appellant's primary contention on appeal is that his confession to this murder was improperly admitted at trial. He argues this is so because—prior to making his confession—he had invoked his Miranda[2] right to remain silent and the police had thereafter failed to honor that right in violation of Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Thus, he urges that the confession was the product of coercive in-station interrogation proscribed by the Supreme Court in Miranda.

I.

A determination of appellant's contention necessarily rests upon the post-arrest facts in the instant case. The record reflects that appellant was captured in the early afternoon of a November day in 1979, after a brief chase, running from the victim's apartment building and was returned by police to the scene for a so-called "show-up" before the surviving eyewitness. She identified him as the man who had entered the victim's apartment and demanded money

---

1. D.C.Code 1981, §§ 22-2401, -3202, -1801(a) (first-degree burglary), -2902 (attempted armed robbery).

2. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

from the two of them—both elderly women. Appellant was advised of his *Miranda* rights and transported to the office of the Homicide Squad at police headquarters. Some 45 minutes had elapsed between his apprehension and his arrival at the station. (Record at 31, 35.) The arresting officer, who had read the *Miranda* warnings in full to appellant, reported to the Homicide Squad the fact of his silence, *viz.*, that: "He [appellant] would not say anything, not even his name."

One Homicide detective knew appellant's name as a result of interviewing appellant in the course of an investigation one year earlier. Detective Warren Donald of the Homicide Squad had then considered appellant McClinnahan the prime suspect in the murders of Helen Lyons and Balese Bursette on September 22, 1978. (Record at 62.) Appellant, in October 1978, came to police headquarters, was advised of his rights and gave an exculpatory statement to Detective Donald concerning the September 1978 double homicide. (Record at 78.) For reasons not clear in this record appellant was not arrested for those murders, but Detective Donald stated to appellant then that he "was pretty sure" that appellant had committed them. Appellant, before leaving police headquarters, laughed and told the detective that he had "been around a long time" and had learned two things: "[F]irst, if you're going to do something, do it alone. And second, don't tell no one you did it, not even your mother." Detective Donald told appellant: "I will be seeing you", as appellant left. (Record at 80.)

Detective Donald was hence able to identify appellant on the day of his arrest in November 1979. Appellant was left alone in the so-called interview room until Detective Charles Shuler arrived from the scene of the homicide at 2:30 p.m. He advised appellant of his *Miranda* rights and he, too, was met with silence on the part of appellant. Specifically, the detective testified at the hearing on the motion to suppress (Record at 131) that appellant "for a good period of time, gave no reaction whatsoever. He just sat there and looked directly ahead.

His eyes wide open staring straight ahead. And after a period of time, my trying to get his attention, asking him if he understood his rights, he turned very slowly to me, looked directly at me, said very clearly that he knew what his rights were and that he understood them."

The following colloquy occurred in the transcript of the direct examination of the detective at the suppression hearing (Record at 131–32):

Q. Sir, what happened after he looked at you at that point?

A. Well, I observed his clothing and the blood on his hands and left the room and called for a mobile crime technician and—

Q. Do you know approximately what time that you called for the mobile crime technician?

A. Approximately 30 minutes after I entered the room, I guess.

Q. And do you know what happened to Mr. McClinnahan, what time did the mobile crime lab technician arrive? How long did it take him to get there?

A. He arrived about 30 minutes after I called him. During that time period Mr. McClinnahan just sat in the room with the door closed, alone.

Q. What were you doing during that time?

A. I was talking with the other witnesses in the case and overseeing generally the investigation that was proceeding.

The detective testified (Record at 133) that it took "45 minutes to an hour" for the "mobile crime lab … man" to complete his procedures. Then, he returned to the interview room "and talked with Mr. McClinnahan.... I talked with him for about 45 minutes and he stared directly ahead during the entire period and said nothing." At no time, according to the witness, did appellant ever say or otherwise indicate that he did not want to answer questions or that he did want an attorney. (Record at 133–34.) Detective Shuler testified that he "was mainly outlining the case that we had against him, trying to show him it was a very strong case." When asked if appellant ever ques-

tioned him about anything, the detective replied (Record at 134): "He never said anything, sir, except that he understood his rights in the beginning." On cross-examination, Detective Shuler reviewed again the sequence of events and admitted that after 45 minutes of silence by appellant he "abandoned" his attempts and asked Detective Donald to go in and speak to him. (Record at 137.) [3]

Detective Donald, when he entered the room at 5 p.m., had been told (Record at 81) that appellant understood his rights "but he just stared as if no one was talking to him." What then transpired is reflected in the transcript of Detective Donald's testimony at the suppression hearing (Record at 63) as follows:

Q. What happened then?

A. I told Mr. McClinnahan that he would not beat the case, that it was a strong case against him and that I was not going to try to sit back there and try to trick him into talking because I knew he was a smart man and I would be wasting my time if I attempted to trick him. I asked him did he ever see the ladies, the two, two ladies concerning that incident, the one that just happened before and he told me no, that that was the first time he saw them. I told Mr. McClinnahan well, I really wasn't interested in that case, that I was more interested in the, my case, the one that I had talked to him prior to. I told him basically that I believed that he had killed the two ladies in my case, that—

Q. Your case is the one that occurred—

A. Helen Lyons and Balese Bursette occurred on September 22nd, 1979. That I felt that he had did it but I couldn't understand why he had did it because I understood the two ladies were nice to him, that he could get anything he wanted from them and it wouldn't have made much sense for him to have killed someone that he could have gotten anything he wanted to get from. At which time, Mr. McClinnahan told me that he was going to tell me some-

thing that he had never told anybody else before in his life, and basically he told me that no one in his family liked him, they didn't care about him, he didn't care about anybody in his family; the only person in the world that he cared anything about was his son and that he saw his son growing up the same way that he grew up. He was very poor, didn't, wasn't able to get the things that he needed and this is why he took the wrong road and he saw his son doing the same thing and that he needed money back in '78 because his son had had a birthday and he couldn't afford to give him a birthday present and his son was having trouble in school and he didn't want him to grow up like him, so he killed Helen Lyons and Balese Bursette because he needed some money.

I continued talking to him, at which time I told him that I wasn't going to try to trick him into giving a typewritten statement . . . . because I had talked to him before and I knew if he wanted to give one, if he wanted—and if he didn't, you know, it wasn't any problem, but I wanted him to give a statement and he told me okay, he would give a statement.

BY MR. ROBERTS:

Q. Now, did you promise him anything to get him to give the statement?

A. No, sir.

Q. Did you threaten him or did anybody threaten him in your presence?

A. No, sir.

Q. Did he ever indicate to you that he didn't want to ask, answer any of your questions or that he wanted a lawyer, that he wanted to talk to anybody else?

A. No, sir.

Q. Did he give you a typewritten statement?

A. Yes, sir, he did.

\*     \*     \*

---

**3.** The relevant transcript of the testimony by Detective Shuler at the suppression hearing is attached as an Appendix to this opinion.

Q. Prior to taking that typewritten statement did you advise Mr. McClinnahan of any rights again?

A. Yes, sir, I did.

Q. What did you specifically advise him?

A. Okay. I read his rights directly from the statement form.

Q. And what was that?

A. Okay. You're under arrest. Before we ask you any questions, you must understand what your rights are. You have the right to remain silent. You are not required to say anything to us at any time or to answer any questions. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we question you and to have him with you during questioning. If you can not afford a lawyer and want one, a lawyer will be provided for you. If you want to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer. Do you understand these rights? Yes. Do you wish to answer any questions? Yes. Are you willing to answer questions without having an attorney present? Yes.

Q. Did he sign the waiver of rights on that?

A. Yes, sir, he did.

Q. Where did he sign that?

A. He signed it right next to do you wish to answer any questions.

Q. How many pages was the statement that he gave you with reference to the murder of Helen Lyons and Balese Bursette?

A. Six pages.

Q. Approximately what time was it that you started that statement?

A. 6:05 p.m.

Q. And approximately what time was it that you completed it?

A. Approximately 8:50 p.m.

Q. Sir, did Mr. McClinnahan sign that statement?

A. Yes, sir, he did.

Q. And where did he sign it?

A. Okay. He signed each page right next to the warning of the rights portion. And he also signed the bottom portion, signature of person giving statement on each page.

Q. At any time while taking this statement did he indicate that he wanted to ask an attorney any questions or ask you any questions or—

A. No, sir, he did not.

Q. Did he ever refuse to answer any of your questions?

A. No, sir, he did not.

Q. Can you explain to the Court how this statement was taken and what was the mechanism—

A. Okay. I already knew his name, so I filled in the top portion of the statement. Then I advised him of his rights and asked him did he want to give a statement, and which he did. Then I asked him one question, James Franklin McClinnahan, after reading and understanding all of your rights do you still want to tell me in your own words any information you may have about the homicide death of Helen Lyons and Balese Bursette and your involvement if any. At which time, he gave a long narrative.

Q. What happened after?

A. After the long narrative, then I began to ask him specific questions and he gave me answers.

BY MR. ROBERTS:

Q. Sir, did there come a time when Mr. McClinnahan gave you a second statement in this case?

A. That's correct, sir.

Q. And when was that?

A. Okay. This was immediately following the first statement.

Q. And where did he sign that statement?

A. Okay. Alongside are you willing to answer any questions without having an attorney present.

Q. And did he sign the statement anywhere else?

A. Yes, sir, he signed each page of the statement on the bottom where it says signature of person giving statement.

Q. And approximately what time was that statement started?

A. Started approximately 9 o'clock.

Q. And what time was that statement completed?

A. 11 o'clock.

Q. How many pages is that statement?

A. Four.

Q. During the time that you were taking these statements did Mr. McClinnahan ever get anything to eat or to drink or anything of that sort?

A. Yes, sir, he had several cups of coffee and I'm not for sure of the exact time, but there came a time when Detective Jackson went to McDonald's and brought back some food. He had two cheeseburgers and some french fries. And I asked Mr. McClinnahan did he want anything to eat. He said all he would like was some french fries, so I gave him the french fries.

Appellant urges on appeal that all of his statements to Detective Donald and both his written confessions to the three murders he gave to Detective Donald should have been suppressed pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which mandates:

Once warnings have been given the subsequent procedure is clear. *If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.* At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. *Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement af-*

*ter the privilege has been once invoked.* (Emphasis added.)

Appellant argues that his silence during Detective Shuler's first interview and then again after the crime lab tests during Detective Shuler's second interview "indicated," within the meaning of *Miranda,* that he wished to remain silent and that he wished the questioning to cease. Therefore, appellant contends that when he later began speaking to Detective Donald and confessed to three murders, his statements were made only after he had invoked his privilege to remain silent and "cannot be other than the product of compulsion, subtle or otherwise," as proscribed by *Miranda.* Thus, appellant urges, the trial court should have suppressed his confessions because such confessions were the product of custodial interrogation conducted *after* he had indicated he wished to remain silent and for the interrogation to cease.

The narrow issue posed in the instant case is whether appellant's continuing silence following his acknowledgement to Detective Shuler that he understood his *Miranda* rights indicated that he wished to remain silent and to cut off the questioning by Shuler and then by Detective Donald.

Preliminarily, we note the teaching of the Supreme Court that silence by the arrestee following his receipt of *Miranda* warnings "is insolubly ambiguous." *Doyle v. Ohio,* 426 U.S. 610, 617, 96 S.Ct. 2240, 2244, 49 L.Ed.2d 91 (1976). As Justice Marshall pointed out in *United States v. Hale,* 422 U.S. 171, 177, 95 S.Ct. 2133, 2137, 45 L.Ed.2d 99 (1975):

At the time of arrest and during custodial interrogation, innocent and guilty alike ... may find the situation so intimidating that they may choose to stand mute. A variety of reasons may influence that decision. In these often emotional and confusing circumstances, a suspect may not have heard or fully understood the question, or may have felt there was no need to reply. [Citation omitted.] ... He may have maintained silence out of fear or unwillingness to incriminate another. Or the arrestee may simply re-

act with silence in response to the hostile and perhaps unfamiliar atmosphere surrounding his detention. In sum, the inherent pressures of in-custody interrogation ... compound the difficulty of identifying the reason for silence. [Footnote omitted.]

We also note that the United States Court of Appeals for the Fourth Circuit has expressly *rejected* the argument appellant makes in the instant case, *viz.,* "that an accused who remains silent, after being given his *Miranda* warnings, signifies his election to remain silent and may not thereafter be questioned in any way without proof of a clear, intelligent and understanding waiver of his right to remain silent." *Taylor v. Riddle,* 563 F.2d 133, 136 (4th Cir.), *cert. denied,* 434 U.S. 1920, 98 S.Ct. 744, 54 L.Ed.2d 768 (1977). The facts of that case are quite similar to what we have before us.

There, the circuit court pointed out: "He [petitioner, the arrestee] had been silent after he had been given his *Miranda* warning not once but twice.... *he did not indicate a desire to exercise his right to remain silent.* When the Sheriff was told of the blood on the petitioner's fingernails, he commented to the petitioner on that fact.... The Sheriff's comment could only have become objectionable *if the petitioner had responded by asserting a wish to remain silent* and the Sheriff had immediately persisted in his questioning. *See* [*Michigan v. Mosley,* 423 U.S. 96, 100, 96 S.Ct. 321, 324, 46 L.Ed.2d 313 (1975)]. Nothing like this, however, occurred. The petitioner voluntarily offered his explanation. That explanation was manifestly admissible." *Id.* (emphasis added).

This court recently concluded that an arrestee who remains silent after receiving the *Miranda* warning has not thereby necessarily indicated that he wishes to remain silent and so continuing questions by the police do not run afoul of *Miranda.* In *Bliss v. United States,* D.C.App., 445 A.2d 625 (1982), the defendant remained silent after being arrested and warned of his rights. The defendant, in response to further comments by the detective about the evidence already in the hands of the police and their surmises about his involvement, responded with smiles and head nods. This court pointed out in *Bliss* that there had never been an *initial invocation* by the defendant of his right to remain silent.[4] The court also concluded that the trial court did not err in finding that the defendant's initial lack of verbal response, taken with his subsequent "non-verbal communication," constituted a waiver of his *Miranda* rights and fully validated the confession he subsequently made.

Appellant vigorously rejects the proposition that his muteness could in any way be taken as a failure to invoke his right to remain silent and to cut off questioning. In essence, appellant advances this syllogism: I was told that I had a right to remain silent, I remained silent, and by my silence I thereby indicated that I desired to remain silent and to have the police cease their questioning. Appellant's argument appears to have been answered by the Supreme Court's discussion in *Michigan v. Mosely* of the safeguards provided by the *Miranda* warning. There, the Court identified the "critical safeguard" provided by the *Miranda* warnings as being the arrestee's right to *cut off questioning.* The Court explained (423 U.S. at 100, 96 S.Ct. at 324):

Through the exercise of his option to *terminate questioning* he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a *person's exercise of that option* counteracts the coercive pressures of the custodial setting. [Emphasis added.]

■ We conclude that appellant's muteness in response to Detective Shuler's ques-

---

4. *See Taylor v. United States,* D.C.App., 380 A.2d 989, 993 (1977) (defendant's *Miranda* rights were not violated since "the [trial] court found that at no time during the evening had he asked for a lawyer or orally refused to answer questions"). In the instant case, the trial court found that appellant never asked for a lawyer or asked that the questioning cease. (Record at 123.)

tioning was no indication in this case that he wished the police to cease such questioning. Put another way, a total silence here by appellant, a calculating person sophisticated in the ways of police procedures,[5] cannot be deemed to have constituted an exercise by him of his right to remain silent and to terminate questioning; some affirmative action on his part was required to indicate he was indeed exercising his option under *Miranda* to terminate questioning so that the police would thereby be placed on notice that their questions should cease. Since appellant's silence under the circumstances did not constitute evidence of the exercise of his option to cut off questioning, *Michigan v. Mosely* does *not* come into play.

While we have concluded that in the instant case appellant's total silence in the presence of Detective Shuler, after acknowledging that he understood his rights, was *not* in and of itself an exercise by appellant of his right to remain silent and to terminate questioning by the police, we are still confronted with the question whether the trial court correctly admitted into evidence appellant's confession to Detective Donald.[6] The precise issue is whether under the circumstances it may be concluded that appellant's confession to the detective was the product of an intelligent and knowing waiver of his *Miranda* right to remain silent. Put another way, if appellant's silence did *not* evidence his desire to terminate questioning, could such silence then be *some* evidence of a knowing and

intelligent waiver of this right to remain silent?

In *North Carolina v. Butler,* 441 U.S. 369, 372, 99 S.Ct. 1755, 1756, 60 L.Ed.2d 286 (1979), the Supreme Court *rejected* the North Carolina Supreme Court's reading of *Miranda* "that waiver of the right to counsel during interrogation will *not* be recognized unless such waiver is 'specifically made' after the *Miranda* warnings have been given." (Emphasis added.) The Court concluded (at 373–75, 99 S.Ct. at 1757–58):

> An express written or oral statement of waiver of the right to remain silent . . . is usually strong proof of the validity of that waiver, *but it is not inevitably either necessary or sufficient to establish waiver.* The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. As was unequivocally said in *Miranda,* mere silence is not enough. *That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights . . . . [I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.* [Footnote omitted.]

\* \* \* \* \* \*

It is an issue with which courts must repeatedly deal . . . the question of waiv-

**5.** We emphasize that the defendant in this case had had 14 prior arrests and had boasted to Detective Donald one year earlier that he (appellant) had "been around a long time" and learned not to tell anyone, not even his mother, what he had done. Moreover, appellant also boasted to Detective Donald at the stationhouse in this case that he was going to beat the case because the police would do something wrong.

**6.** The dissenting judge concludes that "the trial court's [oral] ruling [on appellant's motion to suppress] is too ambiguous to be reviewable" and hence "the record should be remanded for clarification." However, the record reflects that defense counsel and the prosecutor in their arguments to the trial judge—*before* he ruled

on the suppression motion—put at issue whether appellant's silence under the circumstances could have been deemed an exercise of his *Miranda* right to remain silent. (Record at 112, 119.) Then the court, before denying the defense request for suppression, adverted to the fact that appellant after arrest "said nothing" and "did not . . . ever say to anybody I wish an attorney *or I do not want to talk.*" While the court in its oral ruling went on to refer to *Michigan v. Mosley,* this reference was clearly *obiter dicta* and the court's refusal to suppress, in context, was a recognition that this particular defendant, as knowledgeable as he was of his rights, had not under the circumstances "exercised his *Miranda* option to terminate questioning."

er must be determined on "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." [Citations omitted; emphasis added.] [7]

In the instant case, the trial court, in ruling upon the effect of appellant's failure to invoke his right to remain silent and to terminate questioning by Detective Shuler and of appellant's immediately commencing to talk with Detective Donald, considered the "totality of circumstances." (Record at 120–24.) The record reflects that appellant had 14 prior arrests. (Record at 76.) Only the year before his arrest for the present crime, he had voluntarily come to police headquarters to give a statement to Detective Donald about two other murders and had at that time received full *Miranda* warnings. (Record at 78.) Appellant's comment in the instant case to Detective Shuler, after receiving a full warning of his rights and being pressed to acknowledge that he understood those rights, was that he (appellant) knew his rights. As soon as Detective Donald entered the interview room appellant broke the silence he had maintained with Detective Shuler and stated "I know who you are." (Record at 82.) He asked for coffee, subsequently, and the two men "talked." (Record at 83.) When Detective Donald reminded appellant of his prediction a year earlier that he would see appellant again, appellant laughed and said:

"I'm going to beat this case." (Record at 83.) When Detective Donald told appellant "there were witnesses," appellant replied "he didn't care how good the case was . . . the police would have done something or there would be some loophole or a good attorney would find a way to get him off." Thereafter, appellant talked at length with Detective Donald about his life, noting that Detective Donald had been sympathetic in the past, and then confessed.

■ Upon the particular facts and circumstances here, *viz.,* appellant's unusually lengthy experience with the criminal justice system; a full exposition to him of his rights by Detective Shuler, at the stationhouse and by the arresting officer at the scene of this particular crime; and appellant's markedly different reaction in the presence of Detective Donald, whom he knew, from his stony silence in the presence of Detective Shuler, taken together, persuade us that the trial court correctly admitted appellant's confessions. Accordingly, the evidence supports the trial court's ruling that the confessions "based on the total situation" were admissible. *North Carolina v. Butler, supra; Bliss v. United States, supra, accord, Whalen v. State,* 434 A.2d 1346 (Del.1981); *State v. Amado,* 424 A.2d 1057 (R.I.1981).

■ Accordingly, the judgment must be and is

*Affirmed.*[8]

7. *See State v. Ayers,* 433 A.2d 356 (Me.1981), and *State v. Ladd,* 431 A.2d 60 (Me.1981) addressing very similar issues and concluding in *Ladd,* that: "[O]n this evidence the Superior Court justice acted rationally in concluding that defendant's statement was not unambiguous." *Id.* at 63.

8. Appellant's remaining contentions are without merit and may be disposed of as follows. Appellant alleged that the trial court erred in denying counsel's request to withdraw on the eve of trial, but we agree with the trial court's conclusion that the attorney's appointment at the time to another position was insufficient reason to permit withdrawal, and the trial court's inquiry on the record was sufficient to meet the mandate of *Monroe v. United States,* D.C.App., 389 A.2d 811 (1978). *See also Farrell v. United States,* D.C.App., 391 A.2d 755

(1978). Appellant alleged that the evidence was insufficient to support his conviction for first-degree premeditated murder, but *see Ellis v. United States,* D.C.App., 395 A.2d 404, 410 (1978); that the trial court committed plain error in failing to *sua sponte* impose sanctions upon the government for its inability to produce a police officer's notes, but *see Watts v. United States,* D.C.App., 362 A.2d 706 (1976) (en banc); that the trial court improperly allowed testimony regarding the show-up identifications of appellant which were made at the scene of the crime, but *see Singletary v. United States,* D.C.App., 383 A.2d 1064, 1068 (1978); and that the trial court improperly denied his motion for a presentence psychiatric evaluation, but *see United States v. Tucker,* 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972).

APPENDIX

Q. What if anything did you say to Mr. McClinnahan when you saw him at about 2:30?

A. I told him who I was and asked him if he had been, if he was aware of charges against him. And I advised him of his rights, reading verbatim from a PD 47.

Q. PD 47 is what?

A. A Miranda warning of your rights.

Q. Is that the standard police form that is used?

A. Yes.

Q. What was Mr. McClinnahan's reaction to your informing him of the charges and advising him of his rights?

A. He, for a good period of time, gave no reaction whatsoever. He just sat there and looked directly ahead. His eyes wide open staring straight ahead. And after a period of time, my trying to get his attention, asking him if he understood his rights, he turned very slowly to me, looked directly at me, said very clearly that he knew what his rights were and that he understood them.

Q. Sir, what happened after he looked at you at that point?

A. Well, I observed his clothing and the blood on his hands and left the room and called for a mobile crime technician and—

Q. Do you know approximately what time that was that you called for the mobile crime technician?

A. Approximately 30 minutes after I entered the room, I guess.

Q. And do you know what happened to Mr. McClinnahan, what time did the mobile crime lab technician arrive? How long did it take him to get there?

A. He arrived about 30 minutes after I called him. During that time period Mr. McClinnahan just sat in the room with the door closed, alone.

Q. What were you doing during that time?

A. I was talking with the other witnesses in the case and overseeing generally the investigation that was proceeding.

Q. I take it the mobile crime lab man arrived.

A. He did.

Q. And what if anything did he do?

A. He checked the clothing of Mr. McClinnahan and swabbed his hands and his knees where there was obvious blood.

Q. Do you know if any photographs were taken of Mr. McClinnahan and the clothing?

A. Yes, he was taken—photographs were taken. I was observing most of the time while the gentleman was taking the photographs and such. He would remove one set of clothes and take a photograph and then—he had two sets of clothes on—and took photographs of his hands and of the blood on the knee and such before taking the swabs. General procedures.

THE COURT: So the record will be complete, let's say what appeared to be blood.

THE WITNESS: Yes, sir, what appeared to be blood.

THE COURT: All right.

BY MR. ROBERTS:

Q. Sir, did there—approximately how long did it take for the mobile crime lab to complete, man to complete these procedures?

A. Approximately 45 minutes to an hour.

Q. After those procedures were completed, what happened?

A. Well, at that point in time I had a conference with Detective Warren Donough who had knowledge of this gentleman previously. And I asked him if he would assist me in talking with him and I entered the room alone and talked with Mr. McClinnahan.

Q. Did Mr. McClinnahan say anything to you during that time?

A. I talked with him for about 45 minutes and he stared directly ahead during the entire time period and said nothing.

Q. What happened after you tried to talk to him?

A. I left the room; told Detective Donough what had occurred. He entered the room.

Q. Now, during the time that you were in Mr. McClinnahan's presence, at any time did he indicate he didn't want to answer your questions by saying I'm not going to answer your questions, or did he ask for an attorney or anything of that sort?

A. He never said a word to me except in the very beginning when I was so insistent about his rights.

Q. At any time, sir, did you threaten Mr. McClinnahan or promise him anything to try to get him to say anything?

A. No. I was mainly outlining the case that we had against him, trying to show him that it was a very strong case.

Q. At any time did Mr. McClinnahan ask you any questions about anything?

A. He never said anything, sir, except that he understood his rights in the beginning.

MR. ROBERTS: I have no further questions.

THE COURT: Mr. Shipp.

MR. SHIPP: Thank you, Your Honor.

CROSS EXAMINATION
BY MR. SHIPP:

Q. Detective Shuler—I guess Mr. Shuler now, is that correct?

A. Mr. Shuler.

Q. Where are you employed now, Mr. Shuler?

A. I'm a real estate broker in Washington, D.C.

Q. All right. Mr. Shuler, let me get the sequence of events right now. At 2:30 you arrived at the Homicide Squad from the scene, is that correct?

A. No. I actually arrived a little bit earlier than that. I spoke with one of the witnesses before going into the room to talk to him.

Q. Well, approximately what time did you arrive back?

A. About 2:20.

Q. All right. Now, do you know what time my client arrived?

A. He was—he had left the scene before I arrived and I arrived at the scene at about 1 o'clock. He had already gone.

Q. He had already gone to the Homicide Squad?

A. Yes.

Q. Now, when you got there, you spoke with him for the first time around 2:30, is that correct?

A. That's right.

Q. And at that time you read him the PD 47?

A. That's true.

Q. And how long did that take before you got his answer about his rights?

A. Oh, five or ten minutes.

Q. Now, when you read him the PD 47, you told him, of course, he had the right to remain silent, is that correct?

A. Yes, sir. I read it verbatim.

Q. And he did remain silent, is that correct?

A. He sure did.

Q. And he remained silent until you insisted that he understand his rights and respond, is that correct?

A. That's true.

Q. Now then, you went out and did some other work, is that correct?

A. Then I went and got the technician to take the clothing and such and waited for him and also did some other work.

Q. And that was between 2:30 and what time?

A. Oh, 3:00, 3:15.

Q. And the technician arrived, is that correct?

A. Yes.

Q. And he stayed for about 45 minutes?

A. That's right. I was with him during the time period that he was taking the clothing, the photographs, and swabbing.

Q. The swabbing?

A. Yes.

Q. During that time, my client didn't have anything to say, is that correct?

A. No, he didn't have anything to say.

Q. Didn't state anything then. Now, after he had left, you then talked to Detective Donough?

A. That's right.

Q. And you two discussed Mr. McClinnahan?

A. Yes.

Q. And as a result of that conversation, you asked Detective Donough if he would help in your attempts to interrogate my client, is that correct?

A. That's true.

Q. And following that, you went back in to talk to him again?

A. That's true.

Q. How long were you in there that time?

A. Forty-five minutes, approximately.

Q. And you were there by yourself, is that right?

A. Yes, that's true.

Q. And during that time period you, I believe you said you tried to show him that it was a very strong case.

A. That's true.

Q. And at that time he remained silent again?

A. Yes.

Q. For that 45-minute period?

A. Yes.

Q. And that's when you abandoned your attempts and had Detective Donough go in and speak to him, is that correct?

A. That's true.

MR. SHIPP: That's all the questions I have.

THE COURT: Any redirect?

MR. ROBERTS: No.

FERREN, Associate Judge, dissenting:

This case presents the question whether the accused, in remaining silent after *Miranda* warnings, should be understood to have asserted—or waived—his Fifth Amendment right to silence. My colleagues affirm the trial court's implied finding that appellant either did not assert his right or did but eventually waived it before making an incriminating statement. I respectfully dissent because the trial court's ruling is too ambiguous to be reviewable; the record should be remanded for clarification.

After receiving the proper warnings under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), at 2:30 p.m., appellant remained silent for approximately 30 minutes. Pressed to respond, he then told Detective Shuler that "he knew what his rights were and that he understood them." *Ante* at 1349. Appellant said nothing more. After a hiatus of 1¼ hours while a mobile crime technician took photographs, seized appellant's clothing, and swabbed his hands, Detective Shuler returned to question appellant for another 45 minutes. Appellant still said nothing. At about 5:00 p.m. Detective Donald, whom appellant knew from a previous investigation, entered the room at Shuler's request and began to ask questions. Soon thereafter, without expressly waiving his right to remain silent, appellant made an incriminating statement.

Accordingly, we confront the complexity of evaluating an alleged waiver of the right to silence by an accused who had received *Miranda* warnings, was interrogated three times for 1¼ hours during a 2½ hour period, remained silent the entire time (except to say he knew and understood his rights), and then made an incriminating statement.

I.

Cases concerning Fifth Amendment *Miranda* rights come in so many species that an appellate court cannot review them un-

less the trial court carefully determines what is at issue. First, there is the question whether the case concerns an alleged waiver of the right to silence or to counsel—or a waiver of both. Second, as to either category, there is the question whether the case concerns a "first-level" waiver (in response to the initial *Miranda* warnings) or a "second-level" waiver (a change of mind after an initial assertion of rights). *See generally In re C.P.*, D.C.App., 411 A.2d 643, 649 (Ferren, J., dissenting), *vacated*, 449 U.S. 945, 101 S.Ct. 345, 66 L.Ed.2d 210 (1980), *remanded*, 439 A.2d 460 (1981).

"A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). This means, first, that whatever category or level of waiver is at issue, the "relinquishment of the privilege" must be "voluntary." *Miranda, supra* 384 U.S. at 476, 86 S.Ct. at 1629.[1] Second, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege." *Id.* at 475, 86 S.Ct. at 1628.[2]

The government's burden is eased, however, by the Supreme Court's ruling that a waiver need not be express; it can be found in " 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' " *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981) (Fifth Amendment right to counsel)

(quoting *Johnson, supra* 304 U.S. at 464, 58 S.Ct. at 1023 (Sixth Amendment right to counsel)); *North Carolina v. Butler*, 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1757–58, 60 L.Ed.2d 286 (1979) (Fifth Amendment right to counsel); *Bliss v. United States*, D.C. App., 445 A.2d 625, 630–31 (1982) (right to silence). As elaborated below, this "facts and circumstances" test inevitably imposes a responsibility on the trial court to be explicit about the type of waiver at issue (silence and/or counsel), the level of the alleged waiver (first or second),[3] and the record evidence supporting the court's findings.

Any waiver analysis must begin with a trial court finding as to whether the accused has asserted any right after receiving the *Miranda* warnings and options. As to the first level, the right to counsel cannot be asserted effectively unless asserted expressly: the accused has to ask for counsel. Thus, after *Miranda* warnings, failure to ask for counsel amounts to waiver. As to the second level, the right to counsel, once asserted, cannot be waived effectively unless waived affirmatively, and only if "the accused himself initiates further communication," *Edwards, supra* 451 U.S. at 485, 101 S.Ct. at 1885, after the police have "scrupulously honored" the asserted right. *United States v. Alexander*, D.C.App., 428 A.2d 42, 49 (1981).[4]

Assertion of the right to silence is a more complex proposition, for unlike the right to counsel it is not necessarily dependent on an express invocation. An accused's simply re-

---

1. For a related line of cases on voluntariness of confessions *see Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); *Bliss v. United States*, D.C.App., 445 A.2d 625, 631 (1982).

2. Recently, the Supreme Court reaffirmed that *Miranda* waivers not only must be "voluntary" but also must conform to the rigid constitutional standard in *Johnson, supra,* of "a knowing and intelligent relinquishment or abandonment of a known right or privilege." *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981) (right to counsel); *see Wilson v. United States*, D.C.App., 444 A.2d 25 (1982) (right to silence).

3. While not always using "first" or "second" level terminology, this court does make clear, conceptually, what level is at issue. *See, e.g., Bliss, supra* (first-level waiver of right to silence); *Wilson, supra* (second-level waiver of right to silence); *United States v. Alexander*, D.C.App., 428 A.2d 42 (1981) (second-level waiver of right to counsel); *In re C.P., supra* (same); *Jackson v. United States*, D.C.App., 404 A.2d 911 (1979) (same).

4. The Supreme Court has indicated that if an accused who has invoked the Fifth Amendment right to counsel initiates further communication with the police, the question of a second-level waiver of that right is resolved by the "facts and circumstances" test. *See Edwards, supra* 451 U.S. at 486 n. 9, 101 S.Ct. at 1885–86.

maining silent—after a *Miranda* warning that he or she has a right to do so—may reflect an assertion of the right.[5] Or it may not. The trial court must make a finding as to assertion or waiver based on all the facts and circumstances. *Bliss, supra* at 630–31. Once an accused has asserted the right, the question of a second-level waiver is also a matter of the circumstances, beginning with a threshold inquiry into whether the police have "scrupulously honored" the initially-asserted right. *Michigan v. Mosley,* 423 U.S. 96, 104, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975); *see Wilson v. United States,* D.C.App., 444 A.2d 25, 27–30 (1982). The trial court's inquiry is especially sensitive, moreover, for as I read *Mosley, supra,* the Supreme Court has not foreclosed the possibility that, under certain circumstances, the police themselves may initiate the resumption of questioning (after renewal of the *Miranda* warnings), without violating the requirement that they scrupulously honor an asserted right to silence.

In sum, right-to-silence cases reflect two significant differences from right-to-counsel cases: (1) the question of assertion or waiver of the right to silence, both at the first and second levels, may be a much more difficult question of fact; and (2) a second-level waiver of the right to silence may be possible under some circumstances when the police have taken the initiative to resume questioning, whereas, for a second-level waiver of the right to counsel, the accused alone must take the initiative.

It follows that, when an accused eventually talks after hearing his *Miranda* rights and saying nothing whatsoever for a long time (or, as in this case, merely saying that he understands his rights), the trial court faces a very difficult question of fact: (1) whether the accused, by eventually talking,

has manifested a decision not to assert the right to silence and thus has given a first-level waiver—in which case the pattern of police questioning (unless coercive) is not legally significant; or (2) whether, instead, the accused has asserted the right to silence—in which case there can be no second-level waiver unless the trial court finds the police have scrupulously honored that assertion during the period before waiver.

## II.

In the present case, the trial court made the following findings and ruling:

> Based on the total situation before the Court, the divergent testimony, even the testimony of Mr. McClinnahan, the court would have to rule that the statement must be let in because, according to *[Michigan] v. Mosley,* a Supreme Court case. Counsel argues the point that Mr. McClinnahan did not, as the Court recalls, ever say to anybody I wish an attorney or I do not want to talk. The courts have ruled that even if he had said that he didn't want to talk and then he talked later, the courts have ruled that that's permissible. It would not have been permissible if he had said I want an attorney and then the police kept talking to him. That would be illegal and the statements would not be admissible. But based on the total situation, the statements will come in.

I have two problems: First, we cannot tell whether the trial court found a first- or second-level waiver. By citing *Mosley, supra,* a second-level right-to-silence case, the court may be suggesting the latter. On this record of police questioning, however, there is no sure basis for finding that the police

---

5. The possibility that silence itself may reflect an assertion of the right follows from the Supreme Court's view that "silence alone" after *Miranda* warnings, followed eventually by a statement, provides an insufficient basis for finding waiver. *Butler, supra* 441 U.S. at 373, 99 S.Ct. at 1757.

> As was unequivocally said in *Miranda,* mere silence is not enough [to establish waiver]. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated. [*Id.* (footnote omitted).]

"scrupulously honored" an asserted right to silence. If the court meant to find a second-level waiver here, I would be hard pressed not to hold it clearly erroneous.

Second, even if the court had in mind a first-level waiver, it appears from the ruling quoted above that the court may have assumed, erroneously, that "silence alone," *Butler, supra* 441 U.S. at 373, 99 S.Ct. at 1757; note 5 *supra,* followed by an eventual statement, implied non-assertion and thus waiver of the right. To the contrary, circumstances in addition to mere silence followed by a statement are necessary for a finding of first-level waiver. *See Bliss, supra* at 630 (appellant communicated "his understanding and responses through nonverbal means" and thus cannot be said to have asserted his right to silence).

The trial court's ambiguous ruling illustrates why, in right-to-silence cases, it is important for the trial court to analyze, step-by-step, until the issue is resolved: (1) whether there has been an assertion of the right or a first-level waiver; (2) whether the police have scrupulously honored an asserted right; and (3) whether there has been a second-level waiver.[6] Otherwise, the appellate court cannot review. The trial court's ruling here failed to sort out whether appellant's silence itself reflected an assertion, or was evidence of a first-level waiver, of the right to silence. If it was the former, the court failed to address whether the police "scrupulously honored" the asserted right before appellant gave a second-level waiver. *Mosley, supra* 423 U.S. at 104, 96 S.Ct. at 326. Thus, the trial court gave us an unreviewable ruling.

I would remand the record for the trial court to clarify the level of waiver it found and its reasoning. It is not for this court to make that fact-oriented ruling.

6. Commonly, related questions arise as to whether there has been police "interrogation," *see Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Wilson, supra,* of a suspect in "custody." *See Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50

L.Ed.2d 714 (1977); *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *Ford v. United States,* 376 A.2d 439 (1977). Neither question is presented in this case.